942 So.2d 1263 (2006)
STATE of Louisiana, Applicant
v.
Thomas G. HEMPHILL, Jr., Respondent.
No. 41,526-KW.
Court of Appeal of Louisiana, Second Circuit.
November 17, 2006.
Rehearing Not Considered December 6, 2006.
*1267 Jack Wright, Jr., Monroe, for Respondent.
Jerry L. Jones, District Attorney, Madeleine M. Slaughter-Young, Assistant District Attorney, for Applicant.
Before WILLIAMS, GASKINS and MOORE, JJ.
MOORE, J.
The state applied for a supervisory writ asking us to review and overturn a district judge's ruling granting the defendant's motion to suppress. We granted the writ and placed the matter on the next available docket. The parties waived oral argument and submitted the matter on their briefs in connection with the writ application. Based upon our review of the record, we affirm the district court ruling.

Facts
On April 13, 2005 the Metro Narcotics Unit of Ouachita Parish ("MNU"), received an anonymous tip that the defendant was running a methamphetamine lab in a shed near his mobile home, and that the "cooks" generally started after midnight. There was no description of the suspect and the caller was unknown to the MNU. Two days later, detectives from the MNU went to an area near defendant's mobile home shortly after midnight. The residence is located next to defendant's plant nursery business. Detective Randall Pittman and four MNU detectives parked their unmarked vehicle in an agricultural field adjacent to the defendant's property and walked to the defendant's property. At least one of the agents had "HAZMAT"[1] certification. Additional agents remained behind in their vehicles. Det. Pittman was in charge of the operation.
Det. Pittman, the only witness for the state at the hearing on the motion to suppress, testified that he did not identify the shed prior to entering the defendant's yard, but he saw the mobile home and some other structure. He testified that "the shed was very hard to observe . . . at that point" due to vegetation and darkness. He saw no lighting, nor smelled anything. Although the property was only partially fenced, Det. Pittman said that the defendant's property was clearly distinguishable from the agricultural field due to the grass in defendant's yard.
After crossing onto the defendant's property, Det. Pittman said that because the wind was from the east, the agents moved between Bayou DeSiard and the plant farm, where the mobile home and shed were located, to the west side of the shed. Det. Pittman, who had 2½ years experience with the Metro Narcotics Unit, testified that he and the other agents detected the odor of ether, but they could not pinpoint the source of the odor which was coming from the general direction of the mobile home and shed. The testimony does not indicate whether they entered the neighboring property whose boundary from the shed was some twenty feet away.
Using night vision equipment, the officers saw a person walking from the mobile home to the shed. Det. Pittman had received no physical description from the anonymous caller to confirm whether the person observed going into the shed was *1268 the defendant. He testified that he could not tell whether or not the person was a white male, but he did appear to be a male.
Det. Pittman said that they "zoned-in" on the shed, and as they advanced closer to the shed, he heard "metallic" sounds emanating from the shed and the odor of ether became stronger. He testified that the sounds "could have been a person sharpening mower blades," and he could not associate them with any particular meth lab operation. Nevertheless, he concluded that an active meth lab "cook" was occurring, based on his experience of associating the smell of ether with a methamphetamine cook, and the fact that there was some type of activity taking place in the shed.
At this point, Det. Pittman testified that he decided to "flush" the defendant out of the shed, so he ordered other officers who were "there for Mr. Hemphill" in their vehicles to drive down the defendant's driveway with "headlights, numerous headlights shining down the driveway," while he and the other four agents positioned themselves by the door of the shed. "[H]opefully," said Det. Pittman, "Mr. Hemphill would see that, become scared or whatever the case may be, and try to exit the building."
Pittman initially testified that the defendant opened the door, but later changed his testimony, stating that he (Pittman) opened the door after he decided that "it was in everybody's best interest to vacate the shed." In either case, when the door opened, defendant was standing at or near the doorway with an unlighted flashlight in his right hand. Det. Pittman testified that he "reached in" the shed and pulled the defendant out of the shed by his arm, handcuffed him, and led him away from the building.
When asked whether he was able to see anything within the interior or smell anything within the interior of the shed, Det. Pittman first answered as follows:
"[F]rom the moment I grabbed him, and I did not take a ten second break to look around or anything like that. No. I grabbed Mr. Hemphill and moved him from the doorway of that particular shed."
Det. Pittman said the defendant was not armed; however, when asked if the defendant could have been within reach of a weapon, he responded that if the defendant had a weapon close to the doorway, he would have been within grabbing distance of it. He stated that he took Mr. Hemphill into custody from the time he opened the door by handcuffing the defendant and led him away from the building. He also testified that he patted down the defendant and discovered a small, metal can that contained what appeared to be marijuana.
According to Det. Pittman, the door of the shed remained open, and "it was at that point very obvious what was going on inside that building." He stated that, without entering the unlighted shed, he observed various instruments used in the manufacture of methamphetamine inside that were confined to the back left corner of the shed, including a propane tank turned upside down and various cans with tubing sticking out of them. The remainder of the building contained various tools and household items. There was no fire, flame or heat source being utilized at the time, nor were there any lights on in the shed, and defendant's flashlight was turned off.
Based on these observations and the odors associated with meth lab production, *1269 Det. Pittman concluded there was an active meth lab inside the shed. Concerned with the safety of himself, the team, the neighbor's house some 50 feet from the shed and Mr. Hemphill, he sent Detective Harold Freeman, who was his "certified meth lab guy" with HAZMAT certification "to shut this lab down . . . [and] start removing the different components and safely contain the different components that were in there."
Det. Pittman testified that after he handcuffed him, he took Mr. Hemphill to his mobile home where Mr. Hemphill gave oral consent to search his property. Det. Pittman described the defendant as very cooperative. He said the defendant told them where there were some narcotics in the trailer.
From the mobile home, the agents recovered two shotguns and an "over and under" .22 cal rifle/20 gauge shotgun, all of which were legally owned firearms. In the safe, they recovered a .22 caliber pistol, two envelopes with metal containers containing suspected marijuana and two bags of marijuana. (They also found an envelope containing marijuana in the defendant's pocket.) The findings in the safe also included a syringe and a glass vial containing suspected methamphetamine, two tablets of suspected hydrocodone, a blue tablet suspected to be Klonopin, three tablets suspected to be Xanax, a plastic bag with pieces of tablets, and two small bags suspected to contain marijuana, another small plastic bag containing nine suspected Xanax tablets, a prescription bottle of hydrocodone cough syrup, a glass pipe, a set of scales and an envelope with six boxes, each containing pseudoephedrine tablets in the form of "cold and allergy" tablets sold over the counter as Equate Suphedrine and Sudafed and commonly used in the production of methamphetamine.
Among the things confiscated from the shed, the agents found two Mason jars, one containing a clear liquid suspected to be ether and another containing an off-white powder. Det. Pittman testified that they found a can that they suspected contained ether. As to the smell of ether that the detectives said they smelled outside the shed, Pittman attributed it to these two containers, although he could not remember if there were any puncture holes in the can. Other items confiscated from the shed included some jugs and containers with hoses running to them, a gallon Ziploc bag containing ammonia nitrate (i.e. fertilizer), a gallon jug of muriatic acid and a jar containing "suspected salt." Det. Pittman stated that all of these items are associated with the production of methamphetamine. He also testified that the propane tank was turned upside down and occasionally vented a gas.
Det. Pittman stated that the defendant was under arrest when he handcuffed him. He said that he orally advised the defendant of his rights, but he did not obtain a signed confirmation from the defendant that he had been advised of his Miranda rights. He further stated that the defendant willingly gave his consent to search without being under duress.
Contrary to Det. Pittman's testimony, Hemphill testified that it was he who opened the shed door and not Det. Pittman when the latter reached in and grabbed him. Defendant testified that it was impossible for Pittman or the other detectives to see what was going on in the back corner of the 30-foot-long storage shed because the view to the back of the shed was blocked by some restaurant equipment such as fryers and cookers that *1270 Hemphill was storing for a friend. He testified that the equipment blocked any view of the meth lab from the doorway. There were no lights in the shed and it was dark.
Defendant testified that when he was pulled from the shed doorway, he was placed face-down on the ground and handcuffed. On cross-examination, Det. Pittman corroborated defendant's account that he put Mr. Hemphill on the ground and handcuffed him. Defendant said he was held on the ground for approximately one hour with someone's knee in his back, and officers told him that he would stay there all night if they had to wait for a judge to authorize a search warrant. He admitted that he knew that he did not have to consent to authorize the search, but he ultimately did give his consent to search the property.
Defendant admitted that the equipment in the corner of the shed was a meth lab. He stated that the fumes that Det. Pittman allegedly smelled were most likely ammonia because he had just mixed ammonia nitrate with lye to make anhydrous ammonia, which he said is the first step in making methamphetamine. This mixture creates vapors, he said. He admitted that he did have two unopened cans of ether in the shed.
Defendant stated that he was not informed of his Miranda rights, or, if he was, he does not recall it. He said that no one read anything from a card to him. He was not asked to sign anything. He described the scene as "chaotic" around him, while someone held him face down to the ground with their knee in his back. He admitted stating to police that "he did not want to stay there all night."
After the hearing on April 12, 2006, the court took the matter under advisement. It ruled on the motion on May 26, 2006, and found that the warrantless search and seizure were not justified and granted the defendant's motion to suppress the evidence seized from the unlawful search and arrest of defendant. Specifically, the court concluded that the state had not presented evidence that would justify the actions that the officers took. In that regard, it found that the warrantless entry onto the defendant's property was unjustified. It also stated that any exigent circumstances claimed due to the alleged volatility of a meth lab had been "watered down," inasmuch as the officers waited two days after receiving the anonymous tip to investigate the matter. It further found that, although officers may approach citizens and engage in conversation with them, they may not turn an encounter into a forcible detention unless there is legal justification. The court also believed that the officers' actions of handcuffing the defendant and then subsequently seeking verbal consent to search did not comply with the requirements of State v. Vigne, 2001-2940 (La.6/21/02), 820 So.2d 533.
The state applied for supervisory writ of review which we granted and later docketed.

Discussion
The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Similarly, the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. 1, § 5. Warrantless entries into the home for arrest or seizure are *1271 invalid in the absence of exigent circumstances. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment has drawn a firm line at the entrance to the home, and a police officer therefore needs both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into a private premises. State v. Talbert, 449 So.2d 446 (La. 1984); State v. Hathaway, 411 So.2d 1074 (La.1982). Probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed or was committing a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); La. C. Cr. P. art. 213; State v. Raheem, 464 So.2d 293 (La.1985). Exigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment. State v. Hathaway, supra.
In this case, the state contends that the MNU agents had probable cause and exigent circumstances existed to justify the detention or arrest of the defendant and search of the shed, and that, subsequent to his arrest, the defendant freely and voluntarily consented to the search of his property. It contends that the officers did not initially obtain a search warrant before searching the shed because they did not have probable cause based simply on the anonymous tip. However, it argues, the information from the anonymous tip describing the location and the suspicious activity was confirmed "upon arrival of the officers" at defendant's property. Once the activity given by the anonymous tip was confirmed, the agents moved closer to the shed, where they smelled ether, which they associated with meth lab activity based on their prior police experience with meth labs. Rather than obtain a search warrant, the state contends that the volatility and threat of meth labs to the safety of the occupant of the shed, the officers and the neighbors created exigent circumstances that justified detaining/arresting the defendant without a warrant and searching the shed. Thereafter, it argues, the defendant freely consented to the search of his property after being advised of his rights. He further confessed that he was operating a meth lab. Accordingly, the state contends that the district court had no grounds to grant the motion to suppress the evidence seized and the statement of the defendant.

Analysis
We review a district court's ruling on a motion to suppress under the manifest error standard for factual determinations as well as credibility and weight determinations while applying a de novo review to findings of law. State ex rel. Thibodeaux v. State, 2001-2501 (La.3/8/02), 811 So.2d 875; State v. Jones, 36,553 (La.App. 2 Cir. 1/29/03), 840 So.2d 7, writ denied, 03-0956 (La.10/3/03), 855 So.2d 309. Because this was a warrantless search and seizure, the state had the burden to show that probable cause and exigent circumstances justified its actions. State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923.
Our review of the facts established by the testimony and evidence in this record raises the following issues: (1) whether the MNU agents entry onto defendant's property based on the anonymous tip was unlawful; (2) whether the agents had probable cause after approaching the shed and smelling ether; (3) whether the warrantless *1272 seizure of the defendant and search of the shed was justified by exigent circumstances; and, (4) whether the defendant freely consented to the search and was adequately advised of his Miranda rights and waived them.
The Entry Into Defendant's Yard To See the Shed and Investigate
Det. Pittman testified that he received an anonymous tip that defendant was operating a meth lab in a shed south of his mobile home and generally started his cooks after midnight. Anonymous tips provide the lowest indicia of credibility and do not in themselves constitute probable cause for either a search warrant or arrest warrant to issue. Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). This is because agents or police receiving the tip do not know the identity of the informant or his or her relationship to the accused that would indicate the information is credible. An anonymous tip must contain predictive information about the suspect's future criminal behavior and such behavior must be corroborated in order to establish probable cause. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Alabama v. White, supra. Neither reasonable suspicion or probable cause exists by corroborating merely descriptive, non-predictive information. Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (1990). In Gates, supra, the United States Supreme Court set forth a "totality of the circumstances" test to determine whether information from an anonymous informant established probable cause.
In this case, the anonymous tip provided some information that predicted criminal activity as well as merely descriptive information. The caller stated that Mr. Hemphill ran a meth lab in a shed south of his mobile home and that the methamphetamine "cooks" generally started after midnight. Det. Pittman was able to confirm activity after midnight in the shed and associated that activity with meth production by the smell of what he said was ether, but not before entering the defendant's backyard and moving near the shed. The state attempted to establish that Det. Pittman corroborated the requisite predictive elements of the tip before entering defendant's yard by establishing that Det. Pittman saw the mobile home and some kind of other structure "upon arrival of the officers." However, the testimony of Det. Pittman indicates that he only identified a mobile home and some unidentified structure. These are merely general descriptive facts not predictive of any criminal activity. See Florida v. J.L., supra. The existence of a mobile home residence and a structure in the backyard is commonplace in Louisiana, particularly in outlying areas.
We also observe that a photograph in evidence shows that the property was partially enclosed with a privacy fence. The officers entered the defendant's property from the unenclosed portion of the yard that appears to be the backyard of the defendant. Det. Pitman testified that the yard was clearly distinguishable from the field by the grass, so he clearly knew he was entering the yard of the defendant.
Although the district court found that the defendant was adversely affected by the agents' entry into the neighboring property as well as the defendant's property without a warrant, it did specifically state that it had determined that crossing into the defendant's yard itself was a violation of the Fourth Amendment. There has been no argument on appeal that the backyard constituted "open fields," that is, the *1273 land outside the curtilage of the home and was therefore excepted from the warrant requirement of the Fourth Amendment since it is entitled to no more protection than public land. Oliver v. U.S., 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). Nor has it been argued that the backyard was within the curtilage and therefore protected.
The "open fields" doctrine was first enunciated by the Supreme Court in Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and permits police officers to enter and search a field without a warrant. State actors, therefore, do not need probable cause or a warrant to enter and search an open field. United States v. Pinter, 984 F.2d 376, 379 (10th Cir.), cert. denied, 510 U.S. 900, 114 S.Ct. 273, 126 L.Ed.2d 224 (1993) The Fourth Amendment permits the police to search all over one's land, so long as the officers do not cross the boundaries of one's home. United States v. Seidel, 794 F.Supp. 1098, 1105 (S.D.Fla.1992). Probable cause is not an element of the open fields doctrine. Although state actors do need probable cause, they do not need a warrant to seize property from or make an arrest in open fields. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It is "well-settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant . . . assuming that there is probable cause to associate the property with criminal activity." Id. Police are "permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." U.S. v. Gori, 230 F.3d 44 (2nd Cir.10/18/00).
The curtilage of a home is that "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." It is considered part of the home itself and is therefore afforded Fourth Amendment protection. Id. To determine whether an area is part of the curtilage, or extension of the residence's living area, courts look at four factors which indicate how intimately the area is tied to the home itself: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) whether the area is being used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation by passers-by. United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); State v. Raborn, 33,980 (La.App. 2 Cir. 11/15/00), 771 So.2d 877, writ denied, 00-3414 (La.11/2/01), 800 So.2d 868; United States v. Gorman, 104 F.3d 272 (9th Cir.1996).
The record does not show a plat of the property or a layout of the defendant's yard. The photographs in evidence show very little that is probative in this regard; however, they do depict that there is a partial privacy fence near the shed and running along the back or side of the property. There is no information regarding the size of the defendant's property, where his residence is located and where the shed is in relation to his residence, although the photograph shows that the front of the shed was approximately 10 feet from the side of another structure with metal siding. This was possibly the mobile home or trailer, or perhaps another shed. The photo also shows that there were other items, such as an aluminum boat and some 55 gallon drums near the shed. Det. Pittman said the shed was also obscured from view by vegetation which is *1274 not revealed in the photograph. Defendant used the shed for storage of some items and stated that he was also storing some restaurant cookers for a friend. The shed had no porch, but there were concrete stepping stones creating a pathway to the shed door. The defendant also indicated that the neighboring house was closer to the shed than it was to his trailer, indicating that the neighbor's house was on the side opposite the entry door to the shed. According to the defendant, the shed was approximately 20 feet from the property line and perhaps 50 feet from the neighboring two-story house.
Although the evidence in this record to make a determination on this issue is weak, applying an objective standard, we conclude that the defendant had a heightened expectation of privacy in his yard. The yard was partially enclosed and fenced, and distinguishable from adjoining agricultural fields. The shed itself was partially obscured from view by the fence and vegetation, according to Det. Pittman. It was after midnight when the agents were sneaking furtively around the defendant's yard, thereby creating the possibility of a violent confrontation. We also note that the state prosecutor was clearly concerned by the entry into the yard because she tried to establish that the MNU agents confirmed predictive elements from the anonymous tip before entering the defendant's property. This was clearly not established, however, and Det. Pittman testified that the yard was clearly distinguishable from the field and other testimony and evidence indicates that there were some steps taken by the defendant toward privacy. Accordingly, we must conclude that the trial court was not clearly wrong in its finding that the defendant was adversely affected by this entry. We further conclude that the state did not carry its burden in showing that the warrantless entry into the yard was justified by the agent's corroboration of some of the descriptive information from the anonymous tip.
Probable Cause Based On the Smell of Ether
Even if we were to assume that the warrantless entry into the defendant's yard was justified, the next issue is whether the agents obtained probable cause to search or arrest the defendant without a warrant. As stated above, the anonymous tip provided some predictive information regarding the defendant's criminal activities, namely, that the defendant was operating an active meth lab and the meth "cooks" generally began after midnight. The agents arrived at the scene about 12:30 AM. Once in the defendant's yard, they observed, with night vision equipment, a male walking from the trailer to the shed. Det. Pittman testified that he saw the person make three trips back and forth, ending in the trailer, while the defendant testified he only made one trip from his trailer to the shed. At this point in the investigation, there was at least partial confirmation that there was some activity taking place after midnight, albeit nothing criminal at this point. Detectives positioned themselves to the west of the shed, and Det. Pittman said that they smelled a strong odor of ether, but they could not pinpoint the source of the odor. It appeared to be coming from the general direction of the trailer and shed because the wind was from the east. Based upon his experience in drug enforcement, Det. Pittman knew that ether is used in the production of methamphetamine, and his past experience was that this confirmed the existence of an active meth lab. The agents then moved closer to the shed and *1275 Det. Pittman said that the smell of ether was stronger and he heard activity in the shed that sounded like what could have been someone sharpening mower blades and he did not associate it with meth lab activity. Nevertheless, he associated the activity in the shed with an operating meth lab because of the odor from the shed and the fact that there was some activity in the shed, although its exact nature was unknown.
Because this information tended to corroborate the predictive information from the anonymous tip, that is, activity after midnight and the odor associated with methamphetamine production, we conclude that the MNU agents had probable cause that would justify obtaining a search warrant to enter the shed. Det. Pittman, however, elected not to obtain a search warrant. Rather, he decided that he would flush out the defendant from the shed and shut down the meth lab. The state contends that his decision was justified based on exigent circumstances.
Exigency, Seizure of Defendant, and "Plain View"
A warrantless search is per se unreasonable unless the police are able to show that it falls in one of a carefully defined set of exceptions based on the presence of exigent circumstances. United States v. Richardson, 208 F.3d 626 (7th Cir.2000). A police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search; instead, the test is an objective one. See U.S. v. Richardson, 208 F.3d at 629 (7th Cir.4/3/00); U.S. v. Elder, 352 F.Supp.2d 880 (C.D.Ill.1/19/05). As previously stated, exigent circumstances may arise from the need to prevent the offender's escape, minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and preserve evidence from destruction or concealment. State v. Brisban, supra; State v. Hathaway, 411 So.2d 1074 (La.1982).
The district court found that exigent circumstances did not exist to justify the actions of the police. The court believed that exigency based on the concern of police for safety was "watered down," inasmuch as the agents waited two days before investigating the tip. The state argues that the deputies entered the defendant's shed to look for the defendant for the purpose of ensuring the safety of Mr. Hemphill, the agents near the shed and the neighbors in the house next door.
According to Det. Pittman, he decided to shut the operation down after he smelled ether and the activity he heard in the shed. He first attempted to lure the defendant out of the shed by sending for the units that were held back, telling them to come down the driveway with all lights. After positioning himself and the other agents by the shed door, Det. Pittman either opened the door himself, or when defendant opened the door, he reached into the shed and pulled the defendant out. On the one hand, he testified that he did not really take time to look into the shed from the doorway because he was handling the arrest of the defendant. On the other hand, he testified later that he was able to see and smell ether emanating from the meth lab located in the unlighted shed 30 feet from the door in the back corner. Subsequently officers found two unopened containers of ether and a meth lab set up in the shed. Defendant contends that the officers were smelling anhydrous ammonia, which is used in the meth cooking process, and which the defendant admits he was mixing.
We agree with the district court that the agent's actions were unjustified on any of *1276 the grounds constituting exigency. First, there was no likelihood of escape. Det. Pittman and four other agents were present at or near the shed. Additional officers were waiting "there for Mr. Hemphill," presumably to take Mr. Hemphill into custody or to assist in case Mr. Hemphill attempted to escape. Second, once the agents smelled ether and heard activity going on inside, they could have obtained a search warrant provided their intrusion into the yard was justified. If the officers were concerned with safety, they could have moved to a safe distance from the shed and evacuated the neighbors, if they were indeed threatened. Third, the officer's concern for Mr. Hemphill's safety is indeed watered down by the two-day delay investigating the tip.
Hence, we conclude that the district court's determination that exigent circumstances were not present to justify the warrantless arrest of Mr. Hemphill was not plainly wrong.
We also reject the search of the shed based on "plain view" or possibly "plain smell." A warrantless seizure of an item that comes within plain view of an officer in a legitimate position to view the item may be reasonable under the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Guiden, 399 So.2d 194 (La.1981), cert. denied, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982). The plain view doctrine renders a warrantless search reasonable: (1) if the police officer is lawfully in the place from which he views the object; (2) where the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object. Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); Guiden, supra; State v. Willis, 36,759 (La.App. 2 Cir.4/9/03), 843 So.2d 592, writ denied, State ex rel. Willis v. State, 04-1219 (La.4/1/05), 897 So.2d 593.
In order for the "plain view" doctrine to be applicable to the recovery of evidence in this case, it is necessary for the recovering officers to have a right to be in the position from which the view is obtained. In the instant case, Det. Pittman was at or in the doorway of the shed in the defendant's yard. We previously determined that the defendant had a heightened expectation of privacy in his yard, particularly at 12:30 AM, and the agents entered the yard prior to confirming the predictive elements contained in the anonymous tip. Accordingly, the plain view exception to the warrant requirement is inapplicable in this case, as the deputies clearly were not lawfully in the place from which the contraband was viewed.
We also find that the "plain view" testimony was tenuous at best. Det. Pittman admitted that he reached in the shed and pulled the defendant out, handcuffed him, and put him on the ground. He initially said that he did not "take a ten-second break" to look around, but instead pulled the defendant away from the shed. The gist of this testimony was that he was not looking into the shed. Yet, he subsequently testified that he observed the meth lab in the back corner of the unlighted shed as he was taking the defendant into custody from the doorway. Accordingly, we believe the trial court correctly did not consider this testimony to be persuasive.
Even if we assume that their surveillance in the defendant's yard was lawful, we cannot say that the same is true for the entry into the shed. The district court obviously believed that the defendant also *1277 had a heightened expectation of privacy regarding entry into the shed. Based on the record, we cannot say that the district court was clearly wrong.
The Defendant's Inculpatory Statement
The district court found that the state did not carry its burden of showing that Miranda warnings were adequate such that the consent to search and the inculpatory statements he made were freely and voluntarily given, citing State v. Vigne, supra. Apparently the court believed that the defendant was coerced or pressured. Defendant testified that he was placed on the ground face down for almost an hour and told that he would be there all night unless he consented to a search. The defendant could not recall being given any Miranda warnings, although Det. Pittman said he gave them. Ultimately, the district court was not convinced that defendant's waiver of his right against making inculpatory statements was freely and intelligently given.
The state contends that the defendant freely consented to allow the state to search his property. Det. Pittman admitted that he put the defendant on the ground, but claimed it was only for a short time. He denies that any threats were made against the defendant, and stated that the defendant was very cooperative. He testified that he orally advised defendant of his Miranda rights, and the defendant orally gave his consent to search his property. Defendant was not asked to sign any forms to that effect.
A trial judge's ruling on whether or not a consent to search or statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Vigne, supra; State v. Thornton, 351 So.2d 480, 484 (La.1977). Before a confession may be introduced into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979); State v. Vigne, supra. A waiver is not established by showing that a defendant was given the complete Miranda warnings and thereafter gave an incriminating statement. Id. (Citation omitted). Moreover, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id.; Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980).
After a review of the record, we find that the evidence (Det. Pittman's testimony) that the state offered to demonstrate *1278 that Det. Pittman adequately advised the defendant of his rights required by Miranda was equivocal at best. More importantly, the state's evidence that defendant made a knowing and voluntary waiver of those rights is weak and uncorroborated. Although the defendant admitted on cross-examination that he knew he did not have to consent to the search his trailer, which he gave after the agents had already searched the shed, we are not persuaded that the consent was not given without duress or coercion. In fact, the only evidence to that effect was the detective's testimony that, after the defendant was handcuffed and led away, he was very cooperative. The state failed to introduce any documentary evidence or corroborating testimony from the four other agents present at the scene confirming that defendant was advised of his rights and made a knowing and voluntary waiver of his rights before consenting to the search or making his statement. Under these circumstances, we find that the trial court did not abuse its discretion when it determined that the state failed to show that the consent to search was freely and intelligently given and the inculpatory statement complied with the dictates of Miranda. Because of its superior position to observe the witnesses and assess their credibility, the district court's ruling on a motion to suppress is entitled to great weight. State v. Horton, 01-2529 (La.6/21/02), 820 So.2d 556; State v. Jones, supra.

Conclusion
The record in this case does not support overturning the district court's decision that the state did not carry its burden of showing that the warrantless search and seizure were justified by probable cause and exigency. Nor does the record support overturning the district court's conclusions regarding whether the defendant was adequately advised of his Miranda rights, and whether his inculpatory statements and consent to search his residence and shed were freely and voluntarily given. Accordingly, it correctly applied the exclusionary rule in this case. For these reasons, we affirm the district court ruling on the defendant's motion to suppress the evidence seized and the defendant's inculpatory statements.
We remand this case back to the trial court for further proceedings.
RULING ON MOTION TO SUPPRESS AFFIRMED.
GASKINS, J., concurring in part and dissenting in part.
GASKINS, J., concurring in part, and dissenting in part.
I agree with the majority that the officers did not have probable cause to enter the property, and that the state failed to carry its burden that the property entered was an "open field." I do not agree with the majority's discussion about exigent circumstances, under the supposition that the entry was lawful, since the cooking of methamphetamine is a dangerous activity.
I respectfully concur in part, and dissent in part.

APPLICATION FOR REHEARING
Before WILLIAMS, GASKINS, DREW, MOORE and SEXTON, JJ.
Rehearing not considered, not timely.
NOTES
[1] HAZMAT is a commonly used acronym for hazardous materials.