MICHAEL E. KIRBY, Judge.

STATEMENT OF CASE

On April 22, 2005, the State filed a bill of information charging Darell James and other codefendants with one count each of possession of twenty-eight to two hundred grams of cocaine, possession with the intent to distribute marijuana, and possession with the intent to distribute crack cocaine.[1] At his arraignment on May 2, James pled not guilty to all charges. The court heard testimony on pretrial motions on June 24 and July 25, 2005, and it set a ruling date of September 16, 2005. In the aftermath of Hurricane Katrina, the court denied the defendants’ motion to suppress the evidence on March 27, 2006. One of James’ codefendants took writs, but this court denied writs on the basis that the defendant would have an adequate remedy on appeal if ultimately convicted. State v. Wilson, unpub. 2006-0580 (La.App. 4 Cir. *771 6/7/06). The Supreme Court denied writs as well. State ex rel. Wilson v. State, 2006-2832 (La.1/8/07), 948 So.2d 135. The ease was reset several more times due to the unavailability of various defense attorneys. On December 18, defense attorneys filed another motion to suppress the evidence. _[¿On February 19, 2007, the court once again denied the motion to suppress the evidence, and after a preliminary hearing, it found probable cause to hold the defendants for trial. A different codefen-dant noted his intent to seek relief, and this court eventually denied writs. State v. James, unpub. 2007-0336 (La.App. 4 Cir. 4/18/07). On May 1, James withdrew his plea of not guilty to the possession of twenty-eight to two hundred grams of cocaine charge and pled guilty as charged[2], reserving his right to appeal the court’s ruling on his motion to suppress the evidence as per State v. Crosby, 338 So.2d 584 (La.1976). The court then sentenced James to serve five years at hard labor without benefit of parole, probation, or suspension of sentence, the sentence to be served concurrently with his sentences in case # 455-514, wherein he received a five-year sentence for his plea to a separate charge of possession of cocaine[3], and to his six-month sentence in case # 455-554, wherein he pled guilty to simple possession of marijuana, first offense. The court granted James’ motion for appeal on May 9.

FACTS

Darell James was one of four men arrested on March 23, 2005 at the Keep Moving Car Wash located at the corner of N. Prieur and Dumaine Streets. At the June 24, 2005 suppression hearing, Det. Nicole Barbe testified that on that day she and her partner Det. Kori Keaton received information from Sgt. Todd Morrell concerning drug activity at the car wash. Sgt. Morrell told them that he learned from a confidential informant that several subjects were bagging cocaine and | smarijuana at the car wash. Det. Barbe testified that at approximately 10:30 p.m. she and Det. Keaton decided to drive to the business to investigate the tip. She stated that when they arrived, the business looked closed, but they could see a light on inside the building. She testified that she could see that garage doors on the N. Prieur side of the building were chained together but not completely closed. She estimated that the doors were eight to ten feet from the sidewalk, but there was nothing between the doors and the sidewalk to hinder her sight of or movement toward the doors. She stated that she walked up to the doors and looked through the crack. Inside she saw two men sitting at a table on top of which was a freezer bag of what appeared to be marijuana. Small ziplock bags and a handgun were also on the table. Det. Barbe estimated that she was approximately fifteen feet from the table, and she identified the men sitting at the table as the defendants Harry Wilson and Darell James.
Det. Barbe testified that she returned to her partner and told him what she had seen. She testified that they notified dispatch, asking for backup, and then Det. Keaton knocked on the front door of the business while she went back to the garage door. She testified that after Det. Keaton knocked, she saw people running through the building and saw one person climb up *772 onto something in the front of the room. Det. Barbe testified that officers entered and secured the building, handcuffing everyone inside and taking them outside. She stated that she then left to obtain a warrant to search the building. Det. Barbe testified that she called her partner once the warrant was signed, and then she returned to the car wash to assist in the search. She stated that officers seized the freezer bag of marijuana from the rafters of the room where she saw the person climbing. She testified that she saw James in a bathroom flushing something down the toilet when she entered the pbuilding. She stated that no drugs were found during a search of James. She identified those arrested on the scene as James, Wilson, Nathaniel Fournette, and Allen Robichaux.
At the same hearing, Off. Athena Mon-teleone testified that she helped execute the search warrant for the building, but she did not recover any contraband or arrest or search anyone. She estimated that there were seven police units on the scene during the search. She stated that she entered the building after Det. Keaton entered, but she remained in the first room and left after the scene was secured. She stated that when she arrived on the scene, Det. Barbe was outside the building.
Det. Kori Keaton also testified at the June 24, 2005 hearing and stated that after receiving information from Sgt. Morrell concerning the tip from the C.I., he and Det. Barbe drove to the car wash. Det. Keaton testified that he had made arrests from the car wash in the past. He testified that when he and Det. Barbe set up a surveillance of the building, they saw no activity, but there were lights on inside the building. Det. Keaton testified that Det. Barbe walked up to garage doors on the N. Prieur side of the building and looked inside through a crack between the doors. He stated that Det. Barbe told him that she saw two men inside the building, sitting at a table upon which were a plastic bag of marijuana, packaging materials, and a gun. He stated that he then went to the front of the building, while she remained at the side of the building. Det. Keaton testified that he called for backup and knocked on the front door of the business. He stated that there was a sheet over the glass on the door, but the sheet was open, and he could see all the way to the back of the building. He stated that he also announced his presence, and he could see Robichaux run into the room with a gun in his hand. 1 sDet. Keaton testified that Ro-bichaux looked out the window, yelled “5-0,” and ran back out of the room.
Det. Keaton testified that he then saw Fournette come into the room with a brown paper bag in his hand. He stated that he saw Fournette place the bag into a bin located at the door to the second room and cover the bag with a towel. Fournette then went to the window and looked out, and Det. Keaton told him to open the door. Fournette hesitated and then opened the door. Det. Keaton testified that he advised Fournette of his rights and told him that he was under investigation for drug activity. Det. Keaton testified that Four-nette told him that he was the manager of the car wash and asked if there was a problem. Det. Keaton testified he pushed past Fournette, and another officer secured Fournette. Det. Keaton walked into the second room, where he found Robi-chaux sitting on a couch. Det. Keaton testified that Robichaux appeared to be trying to hide something under the couch cushions. Robichaux raised his hands at the officer’s order, dropping a gun and three nickel bags of marijuana. Det. Keaton testified that he secured Robichaux. Det. Keaton stated that Sgt. Morrell found James inside a bathroom that was adjacent to the second room, and James was flush *773 ing small baggies down the toilet. Sgt. Morrell was able to retrieve five bags that contained marijuana. Det. Keaton testified that no one appeared be in the third room or in the last room. After finding no one in the last room, he went back into the third room, which was the one into which Det. Barbe had been looking. Det. Keaton testified that he found Wilson hiding in a loft behind some insulation. Wilson had under him a purple Crown Royal bag, inside of which were several more bags of marijuana.
Det. Keaton testified that after Det. Barbe obtained the warrant for the building, they searched it and found the brown paper bag Det. Keaton had seen 1 fiRobichaux place in the bin sitting between the first and second rooms. Inside the bag were four bags of powder. The officers also seized a bag of individually-wrapped pieces of crack cocaine from the bathroom. In the loft they found the large plastic bag of marijuana. Det. Keaton testified that the return on the search warrant showed that the officers seized 262.99 grams of marijuana, 28.22 grams of crack cocaine, and 225.40 grams of cocaine. Det. Keaton testified that all four defendants were arrested. He stated that Wilson tried to escape when the officers took him outside, but they quickly recaptured him.
' On cross-examination, Det. Keaton testified that the C.I.’s tip indicated that four or five men were packaging marijuana and cocaine at the car wash. Det. Keaton stated that he did not know the C.I.’s identity. He stated that he and Det. Barbe decided to set up a surveillance of the car wash because they knew that the C.I.’s tip alone would not have given them probable cause for the issuance of the warrant. He stated that Det. Barbe told him what she saw through the crack between the doors before he knocked on the front door. He testified that backup arrived before he entered the building because it took a few minutes for anyone to answer his knock. He testified that the gun that Robichaux tried to hide was not a real gun. He admitted that the defendants probably would not have been able to escape the building while the officers were trying to get the search warrant, but he feared that they would try to destroy the drugs if they were left alone in the building during that time. He stated that there might have been females on the premises when they executed the warrant, but the females were not involved in the investigation. He also stated that a task force detained others who were in the area when the backup officers arrived, but these people were detained for reasons other than the drugs inside the car wash.
|7At the July 25, 2005 hearing, Sgt. Todd Morrell testified that he got a tip from a C.I. that three to five men were cutting and bagging crack cocaine and marijuana at the Keep Moving Car Wash. He stated that the tip also indicated that one of the men had a gun. Sgt. Morrell testified that he did not know the informant’s identity, but the C.I. had called and asked for him in the past and had provided information. He stated that the garage doors to the building were generally open during the day and closed at night, and when the doors were closed one would have to walk up to the building to see inside. He testified that Dets. Barbe and Keaton set up a surveillance of the car wash. He testified that when he later arrived on the scene, other officers were also there. He testified that when he entered the building, he found James inside the bathroom, trying to flush bags of marijuana down the toilet. He retrieved five baggies. Sgt. Morrell testified that when he was in one of the rooms, he looked up into a loft and saw some insulation moving. He stated he went up a ladder and found Wilson hiding behind the insulation, and Wilson had a *774 Crown Royal bag containing marijuana. Sgt. Morrell testified that he did not remember any females being inside the building, but there may have been one or two females standing on the corner outside the building.

DISCUSSION

A. Errors Patent

A review of the record reveals no patent errors.

B. Assignment of Error

By his sole assignment of error, the appellant contends that the trial court erred by denying his motion to suppress the evidence. Specifically, he argues that |sDet. Barbe did not have the authority to approach the garage doors to look inside. Without Det. Barbe’s observations through the doors, the officers were not justified in entering the building without a warrant, wherein they found most of the drugs lying in plain view. In addition, the appellant argues that without the information gleaned from Det. Barbe’s observations, there would have been no probable cause for the issuance of the search warrant.
The evidence in this case was seized pursuant to a search warrant. The basis of the warrant was the tip and the drugs observed by Det. Barbe as she looked through the gap in the garage door and by the officers after they entered the building. The appellant does not dispute that there was probable cause for the issuance of the warrant. Instead, he argues that the information gleaned by Det. Barbe when she looked through the door was obtained in violation of his Fourth Amendment rights. He contends that information tainted the warrant, and thus the evidence seized from the building should have been suppressed.
A defendant may not assert the exclusionary rule unless his constitutional right to be free from unreasonable searches and seizures, as guaranteed by the United States and Louisiana Constitutions, has been violated. U.S. v. Ibarra, 948 F.2d 903 (5th Cir.1991). Whether a defendant has a constitutionally protected expectation of privacy involves a two part inquiry. A defendant must first show that he has a reasonable expectation of privacy in the area searched for the items seized. Second, a defendant must also show that society is prepared to accept the expectation of privacy as objectively reasonable. State v. Ragsdale, 381 So.2d 492 (La.1980); State v. Karston, 588 So.2d 165 (La.App. 4 Cir.1991). As noted in State v. Hemphill, |9 41,526, p. 14 (La.App. 2 Cir. 11/17/06), 942 So.2d 1263, 1273[4]:
To determine whether an area is part of the curtilage, or extension of the residence’s living area, courts look at four factors which indicate how intimately the area is tied to the home itself: (1) the area’s proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) whether the area is being used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation by passers-by. United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); State v. Raborn, 33,980 (La.App. 2 Cir. 11/15/00), 771 So.2d 877, writ denied, 00-3414 (La.11/2/01), 800 So.2d 868; United States v. Gorman, 104 F.3d 272 (9th Cir.1996).
In State v. Hines, 323 So.2d 449 (La.1975), the Court held the defendant had no reasonable expectation of privacy rights in a common courtyard of an apartment complex. The courtyard had a low fence and no gates, and the courtyard was open to *775 public view. In United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court found that a barn, which was sixty yards from the residence and outside the fenced area around the residence, was outside of the curtilage of the residence, and thus the defendant did not have a reasonable expectation of privacy in the barn.
By contrast, in Karston, the evidence was seized pursuant to a warrant which recounted that a police officer placed himself in a location where he could observe any activity at an apartment about which the police had received a tip from an untested informant. At the subsequent suppression hearing, that officer testified “that he pushed open a solid black gate which was unlocked in order to secure entry into the courtyard and in turn enter into this private apartment building. After entering, he went to the second floor of the apartment building and concealed himself on the floor of the second floor balcony to watch the activity below.” | ^Karston, 588 So.2d at 166. From his concealed vantage point, the officer witnessed apparent drug transactions, leading to the issuance of the search warrant. On review, this court described the issue as whether the officer “could enter a closed but unlocked gate to a private apartment complex courtyard to establish a surveillance .... ” Id. at 167. The Court noted that the officer had no probable cause or reasonable suspicion to enter the courtyard, but it further noted that “not all intrusions onto property infringe on a person’s reasonable expectation of privacy.” Id. However, considering that the officer entered an area which “was not open to the public but rather was a courtyard to a private apartment complex which was fenced off to the general public by a brick wall and a solid black gate,” the defendant-tenant had a legitimate and reasonable expectation of privacy in the courtyard area outside of his apartment. Id.
Likewise, in Ragsdale, the officer entered the patio connected to the defendant’s apartment. The patio was enclosed by a tall wooden fence with a latched gate, and the slats of the fence were so closely placed that no one could see through the fence. The Court found the nature of the fence, which completely blocked the view of the patio and the apartment off of the patio from the general public, gave the defendant a reasonable expectation of privacy which the officer violated by entering the patio without a warrant.
In State v. Deary, 99-0627 (La.1/28/00), 753 So.2d 200, a police officer walked up onto a porch, looked inside the opened door, and saw the defendant standing with his back to the door. The officer knocked, and the defendant turned and dropped a bag containing what appeared to be cocaine. The Court found that although there was a fence in front of the residence, there was a mailbox on the porch, showing that the residents did not consider the porch to be a private enclave. |nThe Court noted that the officer had just as much right to be on the porch as any casual visitor, and he noticed the contraband the defendant dropped by merely looking though the open door, as could any casual visitor to the porch.
In so finding, the Court relied on its earlier case, State v. Dixon, 391 So.2d 836 (La.1980). Police officers went to the defendant’s trailer to investigate a missing juvenile. No one answered their knock, but one officer looked through the window next to the door and saw a fishbowl and a planter containing what appeared to be marijuana plants, as well as what appeared to be marijuana cigarettes. The officers waited outside the trailer. When the defendant and two companions soon arrived, the officers saw someone throw a bag out *776 the car’s window. The officers retrieved the bag, which contained drugs, and then arrested the three people in the car. The officers also stopped two other cars that soon appeared and found more drugs and paraphernalia. The officers then obtained a search warrant and searched the trailer, finding more drugs and paraphernalia. On appeal, the Court rejected the defendant’s claim that the evidence should have been suppressed because the officer first saw the drugs from the porch. The Court noted that the officer had the same right as anyone else to be on the doorstep, and his observation of the marijuana inside the trailer was not a violation of the defendant’s privacy.
Likewise, in State v. Brisban, 2000-3437 (La.2/26/02), 809 So.2d 923, officers made a narcotics arrest at a residence next door to the apartment building where they later arrested the defendant. The arresting officer testified that he knew that several older people lived in the apartment building, and these people generally sat out on the building’s porch. He testified that these people had told him in the past that if he did not see them on the porch, it was because drug activity |1gwas taking place and they did not want to be involved. There was no one on the porch when the officer made the arrest at the building next door, and the officer walked over to the apartment building and stood on the porch. The door to one of the apartments was open, and the officer could see a man inside the apartment sitting at a table cutting what appeared to be crack cocaine. The defendant was sitting on a sofa in the room. The officer entered the apartment, and the defendant lay down on the sofa and pretended to be asleep. The officer searched the defendant and found two crack pipes with residue in his pocket. The Court rejected the defendant’s claim that the evidence should have been suppressed, finding that while the front porch was part of the curtilage of the building, it had limited privacy in that it could have been approached by anyone. The Court noted that the contraband would have been visible to anyone standing on the porch.
In State v. Campbell, 93-1959 (La.App. 4 Cir. 5/26/94), 640 So.2d 622, officers received a detailed tip concerning the defendant, his residence, and the house where he stored drugs for sale. The officers followed the defendant from his house to the storage residence. The defendant entered the yard through an unlocked gate. Through a fence made of chain-link, the officers watched as he walked over to the house, removed a bag containing a white powder from his pocket, and placed the bag under the house. The officers then watched as the defendant met with a man across the street and gave him an object. The other man swallowed the object before the officers could stop him, but the officers were able to stop the defendant and found that he was carrying a large amount of money. The officers took the defendant back to the house and seized the bag from under the house, finding it contained a large amount of cocaine. The officers later got a warrant to search the defendant’s residence, but they found only residue in a glass |isvial. On appeal, this court found that because the defendant presented no evidence that he owned or rented the house where he hid the cocaine, he had no reasonable expectation of privacy in the house or its yard. This court held that although the bag of cocaine was within the curtilage of the residence, the defendant had no privacy interest in the residence. This court also noted that the officers were able to see him place the bag with the drugs under the house, and they had probable cause and exigent circumstances that allowed them to enter the yard to retrieve the bag of cocaine.
*777 In State v. Paulson, 98-1854 (La.App. 1 Cir. 5/18/99), 740 So.2d 698, police officers drove to the defendant’s house and parked in his driveway to investigate a tip they had received. An officer in one of the cars looked over to a part of the front yard and saw marijuana plants growing in a plot. Although the plants were not visible from the street because of a wooden fence, they were visible from the driveway, which had no fence or gate on it. The court rejected the defendant’s claim that his right to privacy had been violated, finding that anyone on the driveway could have seen the marijuana, and thus the defendant did not have a reasonable expectation of privacy.
This court found no reasonable expectation of privacy in State v. Baker, 99-2846 (La.App. 4 Cir. 10/18/00), 772 So.2d 225. Officers were responding to a call when they saw the defendant sitting on the porch of the residence next door. They saw the defendant become nervous and drop a baggie into the grass, and when they retrieved the bag, they found it contained cocaine. This court held that the defendant had no reasonable expectation of privacy in the unfenced front yard where he threw the cocaine.
|14In State v. Julian, 2000-1238 (La.App. 4 Cir. 3/14/01), 785 So.2d 872, this court found that the officers were justified in entering the back yard of the residence in front of which they had seen a drug transaction. The officers had received information concerning drug sales from the residence, and from their surveillance point they saw the codefendant, who fit one of the descriptions given by the informant, standing in the alleyway which led to the back of the residence. While the officers watched, they saw the codefendant engage in what appeared to be a drug transaction in front of the residence. While some officers arrested the codefendant, others walked down the alleyway to the back of the residence, where they saw several people, including the defendant, standing around a washer that had crack cocaine on top of it. The defendant threw down a bag of marijuana as the officers entered the back yard. The officers arrested him, searched him, and found heroin in his pocket. On appeal, this court found that the officers had probable cause to believe there were drugs in the back yard (because the codefendant had come from that direction prior to the drug sale) and had exigent circumstances to enter the yard.
Most recently, in Hemphill, the appellate court upheld the trial court’s suppression of the evidence discovered when police officers, acting only on a tip, entered the defendant’s back yard and discovered that he was running a methamphetamine lab. The tip indicated that the lab was being run in a shed behind the defendant’s trailer and that the defendant “cooked” the methamphetamine after midnight. The officers waited a few days and then approached the defendant’s property after midnight across a neighbor’s land. The defendant’s land was partially fenced, and it was apparent to the officers when they actually entered the defendant’s land because the vegetation changed to grass. |1BSome of the officers walked into the defendant’s yard and soon smelled ether, which they knew was used in the manufacture of methamphetamine. They saw someone leave the trailer, walk to the shed, and enter it. The officers also heard activity inside the shed. Other officers drove down the defendant’s driveway to the shed using bright lights in an effort to flush the person out of the shed. The officers opened the shed door and found the defendant inside, along with equipment for making methamphetamine. The trial court suppressed the evidence, finding that the defendant had a privacy right in the yard and the shed, and the officers did not have probable cause or exigent circum *778 stances to enter the defendant’s property. On review, the appellate court affirmed the trial court’s ruling, also finding that the officers lacked probable cause until they had entered the defendant’s property. The court noted that the property was partially enclosed by a privacy fence, but the part of the yard they entered was not encumbered by the fence. Nonetheless, the court noted that the partial fence evinced a desire by the defendant to distinguish his property from the open land adjacent to it. Based upon the fact that the “there were some steps taken by the defendant toward privacy,” the appellate court found that the trial court “was not clearly wrong in finding that the defendant was adversely affected by this entry.” Id. at p. 16, 942 So.2d at 1274.
Here, Det. Barbe testified that from across the street she could tell that lights were on inside the building. She testified that she walked up to the building, looked through a crack between the garage doors, and saw Wilson and the appellant sitting at a table, packaging marijuana. She estimated that the door was eight to ten feet from the sidewalk, and there was nothing between the sidewalk and the doors to impede her movement. As noted by the trial court when it denied lifithe motion to suppress the evidence, Det. Barbe was in an area that was open to the public, off the sidewalk and not impeded by a fence or any other barrier that would evince an expectation of privacy. She did not enter the building, but instead stood outside and looked through a crack between the doors, just as any member of the public would have been able to do. Based upon the cases cited above, it appears that the trial court was correct in its assessment that Det. Barbe’s looking through the crack between the garage doors did not violate a reasonable expectation of privacy. Thus, her actions were not unlawful, and the information she gleaned from looking through the crack between the doors could be lawfully considered by the magistrate when he issued the search warrant. As noted above, the appellant makes no argument that there was insufficient probable cause for the issuance of the warrant.[5]
Appellate courts have held that a “trial court is vested with great discretion when ruling on motion to suppress.” State v. Scull, 93-2360, p. 9 (La.App. 4 Cir. 6/30/94), 639 So.2d 1239, 1245. See also State v. Jones, 2002-1931 (La.App. 4 Cir. 11/6/02), 832 So.2d 382; State v. Briley, 2001-0143 (La.App. 4 Cir. 10/3/01), 798 So.2d 1191. Given the circumstances of this case, we find the trial court did not err by finding that Det. Barbe’s actions did not violate a reasonable expectation |17of privacy the appellant had in the building. Thus, the trial court did not err by denying the appellant’s motion to suppress the evidence. This claim has no merit.
*779 Accordingly, we affirm the appellant’s conviction and sentence.
AFFIRMED.
BELSOME, J., concurs with reasons.

. Also charged in the same bill with the same offenses were Nathaniel Fournette, Allen Ro-bichaux, and Harry Wilson. Fournette and Robichaux were later convicted, while Wilson pled guilty. These defendants are not involved in this appeal.

. Although the minute entry of this date indicates James pled guilty as charged to all three counts, the transcript of the plea and the waiver of rights form indicate he pled guilty only to the one count.

. James pled guilty under Crosby with respect to this plea as well. His appeal of that plea is pending, 2007-KA-1104. It involves a separate incident and is not a part of this appeal.

. Writ denied 2006-2976 (La.3/9/07), 949 So.2d 441.

. Arguably, the officers' entry into the building prior to the issuance of the warrant was unlawful because although they had probable cause to believe that there were drugs in the building, any exigent circumstances they had were created by Det. Keaton knocking on the door. See Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); State v. Kirk, 2000-0190 (La.App. 4 Cir. 11/13/02), 833 So.2d 418 State v. Jones, 2002-1931, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 382, 386. However, it is unclear if any information gleaned from the entry was actually put in the search warrant affidavit, and in any event, the C.I.'s tip and Det. Barbe’s observations through the garage doors alone supplied probable cause for the issuance of the warrant. Thus, even if the officers’ initial entry was unlawful, the evidence need not be suppressed because it inevitably would have been discovered pursuant to a warrant based upon Det. Barbe’s observation. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); State v. Welch, 449 So.2d 468 (La.1984).