989 So.2d 199 (2008)
STATE of Louisiana
v.
Nathaniel FOURNETTE and Allen A. Robichaux.
No. 2008-KA-0254.
Court of Appeal of Louisiana, Fourth Circuit.
July 2, 2008.
*200 Keva Landrum-Johnson, District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for the State of Louisiana.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Nathaniel Fournette.
John Harvey Craft, Louisiana Appellate Project, New Orleans, LA, for Allen Robichaux.
(Court Composed of Judge DENNIS R. BAGNERIS, SR., Judge EDWIN A. LOMBARD, Judge Pro Tempore MOON LANDRIEU).
MOON LANDRIEU, Judge Pro Tempore.
The defendants-appellants, Nathaniel Fournette and Allen Robichaux, were charged with one count each of possession of at least twenty-eight but less than 200 grams of cocaine, possession with the intent to distribute marijuana, and possession with the intent to distribute crack cocaine.[1] At their arraignment, they both pled not guilty to all charges. The defendants filed a motion to suppress the evidence against them, which the trial court denied. One of the codefendants took writs, but this court denied writs on the basis that the defendant would have an adequate remedy on appeal if ultimately *201 convicted. State v. Wilson, unpub. XXXX-XXXX (La.App. 4 Cir. 6/7/06). The Supreme Court denied writs as well. State ex rel. Wilson v. State, 2006-2832 (La.1/8/07), 948 So.2d 135.
The defendants later filed another motion to suppress the evidence. The court once again denied the motion to suppress the evidence, and after a preliminary hearing, it found probable cause to hold the defendants for trial. Fournette noted his intent to seek relief, and this court eventually denied his writ, noting that he would have an adequate remedy on appeal if ultimately convicted. State v. James, unpub. XXXX-XXXX (La.App. 4 Cir. 4/18/07).
Following a trial, a twelve-person jury found Fournette and Robichaux guilty as charged as to the first three counts. The court sentenced Fournette and Robichaux each to serve thirty years at hard labor, the first five years without benefit of parole, probation, or suspension of sentence, and to pay a fine of $50,000 as to the first count, to serve thirty years at hard labor as to the second count, and to serve thirty years at hard labor, the first two years without benefit of parole, probation, or suspension of sentence as to the third count, the sentences to run concurrently. The defendants appealed.

FACTS
Det. Corey Keaton testified at trial that on March 23, 2005, he was employed as a detective with N.O.P.D. Det. Keaton testified that at approximately 10:30 p.m. on that date, he and his partner Det. Nicole Barbe were on patrol when they came to the corner of N. Prieur and Dumaine Streets, where the Keep Moving Car Wash was located. Det. Keaton testified that although the business was closed, they could see that lights were on inside the business. Det. Keaton testified that he and his partner stopped to watch the business for a few minutes. He testified that on the N. Prieur side of the business, they could see what he described as a set of bay doors that were chained together, but a gap remained, and the officers could see light coming through the crack in the doors. Det. Keaton testified that Det. Barbe walked up to the doors and looked inside. He stated that she told him that she could see marijuana and a gun inside the building.
Det. Keaton testified that he walked to the front door, which was located at 1937 Dumaine, and pounded on the door, announcing his presence. He testified that next to the door was a small window that was covered from the inside by a sheet, but one corner of the window was not covered, and he could see inside the business. He testified that he could see the first room and down a hallway that led off of the front room. He testified that no one immediately answered his knocking, but he could see people running around inside the building. He testified that he saw Allen Robichaux run to the front door, look out through the window, turn and yell "5-0," and then run back toward the rear of the building. Det. Keaton stated that he could see a gun in Robichaux's hand as he ran. Det. Keaton stated that he continued pounding on the door and announcing his presence, and he saw Nathaniel Fournette walk into the first room. He stated that Fournette was carrying a brown paper bag, and he saw Fournette place the bag in a bin located between the first room and the hallway, place a towel over the bag, and then close the bin. At that point, Fournette came to the door, and Det. Keaton ordered him to open it. Fournette did not immediately comply, but eventually he opened the door. Det. Keaton testified that he had spoken with Fournette in the past, and Fournette had identified himself as the manager of the car wash.
*202 Det. Keaton testified that he spoke with Fournette and eventually pushed inside past him. He stated that he walked through the first room and into the hallway. A second room opened off the hallway, and inside the room Det. Keaton saw Robichaux, who had his hand down inside the cushions of a sofa upon which he was sitting. When Robichaux removed his hand from the cushions, he dropped to the floor a gun and three bags of what appeared to be marijuana. He testified that the gun was found to be a plastic replica of a real gun. Det. Keaton testified that at the same time, Sgt. Todd Morrell, a fellow officer, detained Darrell James in the bathroom that also opened onto the hallway. Det. Keaton testified that he walked back farther into the building to the room that contained the bay doors. He testified that Sgt. Morrell apprehended Harry Wilson in a loft.
Det. Keaton testified that after all of the men had been secured, Det. Barbe left the scene and obtained a search warrant. Pursuant to the warrant, the officers searched the building. From inside the bin in the front room, Det. Keaton retrieved the brown paper bag that was found to contain three plastic bags, each holding what he described as a "brick" of cocaine, as well as a fourth smaller bag of cocaine. Det. Keaton testified that Sgt. Morrell recovered from the loft a Crown Royal bag containing small green ziplock bags of marijuana. He testified that Det. Barbe also searched the loft and found a large bag of loose marijuana, which she described as the bag she saw lying on a table in the back room when she looked through the gap in the doors. Det. Keaton testified that in the bathroom the officers retrieved a plastic bag of individually-wrapped pieces of crack cocaine and additional ziplock baggies of marijuana.
On cross-examination, Det. Keaton estimated that he pounded on the door for a minute to a minute and a half before Fournette opened the door. Det. Keaton agreed that many people entered and left the building during the workday and that the rooms afforded many hiding places. He testified that officers also seized a partially-burned cigar containing marijuana from Robichaux when he was searched incidental to his arrest.
Det. Nicole Barbe testified that what she described as garage doors were located on the N. Prieur side of the building. She testified that she walked up to the doors, which were chained together but had a five-inch gap between the doors. She stated that inside the building she could see James and Wilson seated at a table, upon which were a large bag of marijuana, some small baggies consistent with "nickel" bags, and a handgun. Det. Barbe testified that she told Det. Keaton what she had seen, and he went to the front door and began pounding on it, while she remained at the side door. She testified that when Det. Keaton began pounding on the door, she saw people running through the room, and she saw one person climbing up a wall. She testified that she head someone yell "5-0," and she called for backup and went to the front of the building to help Det. Keaton. She testified that someone opened the front door just as backup officers arrived on the scene. She stated that she followed Det. Keaton inside and detained Fournette, handcuffing him and passing him to another officer. Det. Barbe testified that she saw Robichaux in the second room, trying to stuff something down into a sofa's cushion. She testified that Det. Keaton detained Robichaux, while Sgt. Morrell detained James in the bathroom across the hall. She testified that she knew at least one more person was in the building, and she walked back to the room where she had seen the marijuana. *203 She testified that the officers found Wilson hiding in a loft. Det. Barbe testified that she obtained a search warrant, and the officers searched the building when she returned with the warrant. She testified that she searched the rafters in the back room and found the bag of marijuana that she had seen on the table in the room.
On cross-examination, Det. Barbe testified that she could see the entire back room when she looked through the crack in the doors because she was right next to the doors when she looked inside. She testified that she did not see any cocaine when she looked through the gap.
Det. Collette Booth testified that she was one of the backup officers who responded that night. She testified that several police cars were present when she arrived, and one officer handed Fournette to her. Det. Booth testified that she did not search Fournette nor recover any drugs.
Sgt. Todd Morrell testified that he also was a backup officer that night. He testified that when he arrived, Det. Barbe was still outside and Det. Keaton had just entered the building. He testified that he followed Det. Keaton inside and went down the hallway to the bathroom, where he found James trying to flush baggies of marijuana down the toilet. He testified that he detained James and then went to the big room in the back. He testified that he looked up at the loft in the room and saw the insulation moving. Sgt. Morrell testified that he went into the loft and found Wilson hiding under the insulation. Under Wilson was a Crown Royal bag and some marijuana.
Off. William Giblin was qualified as an expert in the analysis of narcotics. He testified that he tested four bags of white granular material that weighed 202.5 grams and was positive for cocaine. He tested several pieces of a white rock-like material that were positive for cocaine and several other bags of a substance that tested positive for cocaine. He also tested several green plastic baggies that weighed sixty-two grams and were positive for marijuana as well as a partially-burned cigar that was also positive for marijuana.

DISCUSSION

A. Errors Patent
A review of the record reveals no errors patent.

B. Assignment of Error
By their sole assignment of error, both appellants contend that the trial court erred by denying their motion to suppress the evidence. As noted above, Fournette and a codefendant both sought writs on this issue, but both writs were denied because the defendants would have an adequate remedy on appeal if ultimately convicted. In addition, another codefendant raised this issue in his appeal, and this court found no merit to his arguments, some of which are raised in the present appeal.
This court in State v. James, XXXX-XXXX (La.App. 4 Cir. 3/12/08), 980 So.2d 769, summarized the testimony adduced at the suppression hearings:
Darell James was one of four men arrested on March 23, 2005 at the Keep Moving Car Wash located at the corner of N. Prieur and Dumaine Streets. At the June 24, 2005 suppression hearing, Det. Nicole Barbe testified that on that day she and her partner Det. Kori Keaton received information from Sgt. Todd Morrell concerning drug activity at the car wash. Sgt. Morrell told them that he learned from a confidential informant that several subjects were bagging cocaine and marijuana at the car wash. *204 Det. Barbe testified that at approximately 10:30 p.m. she and Det. Keaton decided to drive to the business to investigate the tip. She stated that when they arrived, the business looked closed, but they could see a light on inside the building. She testified that she could see that garage doors on the N. Prieur side of the building were chained together but not completely closed. She estimated that the doors were eight to ten feet from the sidewalk, but there was nothing between the doors and the sidewalk to hinder her sight of or movement toward the doors. She stated that she walked up to the doors and looked through the crack. Inside she saw two men sitting at a table on top of which was a freezer bag of what appeared to be marijuana. Small ziplock bags and a handgun were also on the table. Det. Barbe estimated that she was approximately fifteen feet from the table, and she identified the men sitting at the table as the defendants Harry Wilson and Darell James.
Det. Barbe testified that she returned to her partner and told him what she had seen. She testified that they notified dispatch, asking for backup, and then Det. Keaton knocked on the front door of the business while she went back to the garage door. She testified that after Det. Keaton knocked, she saw people running through the building and saw one person climb up onto something in the front of the room. Det. Barbe testified that officers entered and secured the building, handcuffing everyone inside and taking them outside. She stated that she then left to obtain a warrant to search the building. Det. Barbe testified that she called her partner once the warrant was signed, and then she returned to the car wash to assist in the search. She stated that officers seized the freezer bag of marijuana from the rafters of the room where she saw the person climbing. She testified that she saw James in a bathroom flushing something down the toilet when she entered the building. She stated that no drugs were found during a search of James. She identified those arrested on the scene as James, Wilson, Nathaniel Fournette, and Allen Robichaux.
At the same hearing, Off. Athena Monteleone testified that she helped execute the search warrant for the building, but she did not recover any contraband or arrest or search anyone. She estimated that there were seven police units on the scene during the search. She stated that she entered the building after Det. Keaton entered, but she remained in the first room and left after the scene was secured. She stated that when she arrived on the scene, Det. Barbe was outside the building.
Det. Kori Keaton also testified at the June 24, 2005 hearing and stated that after receiving information from Sgt. Morrell concerning the tip from the C.I., he and Det. Barbe drove to the car wash. Det. Keaton testified that he had made arrests from the car wash in the past. He testified that when he and Det. Barbe set up a surveillance of the building, they saw no activity, but there were lights on inside the building. Det. Keaton testified that Det. Barbe walked up to garage doors on the N. Prieur side of the building and looked inside through a crack between the doors. He stated that Det. Barbe told him that she saw two men inside the building, sitting at a table upon which were a plastic bag of marijuana, packaging materials, and a gun. He stated that he then went to the front of the building, while she remained at the side of the building. Det. Keaton testified that he called for backup *205 and knocked on the front door of the business. He stated that there was a sheet over the glass on the door, but the sheet was open, and he could see all the way to the back of the building. He stated that he also announced his presence, and he could see Robichaux run into the room with a gun in his hand. Det. Keaton testified that Robichaux looked out the window, yelled "5-0," and ran back out of the room.
Det. Keaton testified that he then saw Fournette come into the room with a brown paper bag in his hand. He stated that he saw Fournette place the bag into a bin located at the door to the second room and cover the bag with a towel. Fournette then went to the window and looked out, and Det. Keaton told him to open the door. Fournette hesitated and then opened the door. Det. Keaton testified that he advised Fournette of his rights and told him that he was under investigation for drug activity. Det. Keaton testified that Fournette told him that he was the manager of the car wash and asked if there was a problem. Det. Keaton testified he pushed past Fournette, and another officer secured Fournette. Det. Keaton walked into the second room, where he found Robichaux sitting on a couch. Det. Keaton testified that Robichaux appeared to be trying to hide something under the couch cushions. Robichaux raised his hands at the officer's order, dropping a gun and three nickel bags of marijuana. Det. Keaton testified that he secured Robichaux. Det. Keaton stated that Sgt. Morrell found James inside a bathroom that was adjacent to the second room, and James was flushing small baggies down the toilet. Sgt. Morell was able to retrieve five bags that contained marijuana. Det. Keaton testified that no one appeared be in the third room or in the last room. After finding no one in the last room, he went back into the third room, which was the one into which Det. Barbe had been looking. Det. Keaton testified that he found Wilson hiding in a loft behind some insulation. Wilson had under him a purple Crown Royal bag, inside of which were several more bags of marijuana.
Det. Keaton testified that after Det. Barbe obtained the warrant for the building, they searched it and found the brown paper bag Det. Keaton had seen Robichaux place in the bin sitting between the first and second rooms. Inside the bag were four bags of powder. The officers also seized a bag of individually-wrapped pieces of crack cocaine from the bathroom. In the loft they found the large plastic bag of marijuana. Det. Keaton testified that the return on the search warrant showed that the officers seized 262.99 grams of marijuana, 28.22 grams of crack cocaine, and 225.40 grams of cocaine. Det. Keaton testified that all four defendants were arrested. He stated that Wilson tried to escape when the officers took him outside, but they quickly recaptured him.
On cross-examination, Det. Keaton testified that the C.I.'s tip indicated that four or five men were packaging marijuana and cocaine at the car wash. Det. Keaton stated that he did not know the C.I.'s identity. He stated that he and Det. Barbe decided to set up a surveillance of the car wash because they knew that the C.I.'s tip alone would not have given them probable cause for the issuance of the warrant. He stated that Det. Barbe told him what she saw through the crack between the doors before he knocked on the front door. He testified that backup arrived before he entered the building because it took a few minutes for anyone to answer his knock. He testified that the gun that *206 Robichaux tried to hide was not a real gun. He admitted that the defendants probably would not have been able to escape the building while the officers were trying to get the search warrant, but he feared that they would try to destroy the drugs if they were left alone in the building during that time. He stated that there might have been females on the premises when they executed the warrant, but the females were not involved in the investigation. He also stated that a task force detained others who were in the area when the backup officers arrived, but these people were detained for reasons other than the drugs inside the car wash.
At the July 25, 2005 hearing, Sgt. Todd Morrell testified that he got a tip from a C.I. that three to five men were cutting and bagging crack cocaine and marijuana at the Keep Moving Car Wash. He stated that the tip also indicated that one of the men had a gun. Sgt. Morrell testified that he did not know the informant's identity, but the C.I. had called and asked for him in the past and had provided information. He stated that the garage doors to the building were generally open during the day and closed at night, and when the doors were closed one would have to walk up to the building to see inside. He testified that Dets. Barbe and Keaton set up a surveillance of the car wash. He testified that when he later arrived on the scene, other officers were also there. He testified that when he entered the building, he found James inside the bathroom, trying to flush bags of marijuana down the toilet. He retrieved five baggies. Sgt. Morrell testified that when he was in one of the rooms, he looked up into a loft and saw some insulation moving. He stated he went up a ladder and found Wilson hiding behind the insulation, and Wilson had a Crown Royal bag containing marijuana. Sgt. Morrell testified that he did not remember any females being inside the building, but there may have been one or two females standing on the corner outside the building.
James, at pp. 2-7, 980 So.2d at 771-774.

Det. Barbe's Obsevation Through The Garage Doors
The appellants first argue that Det. Barbe's action in walking up to the garage doors and looking inside was an illegal violation of their right to privacy. In James, this court discussed at length the application of the right to privacy to criminal activity observed within a protected area, and because the facts in this case are the same as those in James, this court's discussion is provided:
A defendant may not assert the exclusionary rule unless his constitutional right to be free from unreasonable searches and seizures, as guaranteed by the United States and Louisiana Constitutions, has been violated. U.S. v. Ibarra, 948 F.2d 903 (5th Cir.1991). Whether a defendant has a constitutionally protected expectation of privacy involves a two part inquiry. A defendant must first show that he has a reasonable expectation of privacy in the area searched for the items seized. Second, a defendant must also show that society is prepared to accept the expectation of privacy as objectively reasonable. State v. Ragsdale, 381 So.2d 492 (La.1980); State v. Karston, 588 So.2d 165 (La.App. 4 Cir.1991). As noted in State v. Hemphill, 41,526, p. 14 (La.App. 2 Cir. 11/17/06), 942 So.2d 1263, 1273[2]:

*207 To determine whether an area is part of the curtilage, or extension of the residence's living area, courts look at four factors which indicate how intimately the area is tied to the home itself: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) whether the area is being used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation by passers-by. United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); State v. Raborn, 33,980 (La.App. 2 Cir. 11/15/00), 771 So.2d 877, writ denied, 00-3414 (La.11/2/01), 800 So.2d 868; United States v. Gorman, 104 F.3d 272 (9th Cir.1996).
In State v. Hines, 323 So.2d 449 (La. 1975), the Court held the defendant had no reasonable expectation of privacy rights in a common courtyard of an apartment complex. The courtyard had a low fence and no gates, and the courtyard was open to public view. In United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court found that a barn, which was sixty yards from the residence and outside the fenced area around the residence, was outside of the curtilage of the residence, and thus the defendant did not have a reasonable expectation of privacy in the barn.
By contrast, in Karston, the evidence was seized pursuant to a warrant which recounted that a police officer placed himself in a location where he could observe any activity at an apartment about which the police had received a tip from an untested informant. At the subsequent suppression hearing, that officer testified "that he pushed open a solid black gate which was unlocked in order to secure entry into the courtyard and in turn enter into this private apartment building. After entering, he went to the second floor of the apartment building and concealed himself on the floor of the second floor balcony to watch the activity below." Karston, 588 So.2d at 166. From his concealed vantage point, the officer witnessed apparent drug transactions, leading to the issuance of the search warrant. On review, this court described the issue as whether the officer "could enter a closed but unlocked gate to a private apartment complex courtyard to establish a surveillance...." Id. at 167. The Court noted that the officer had no probable cause or reasonable suspicion to enter the courtyard, but it further noted that "not all intrusions onto property infringe on a person's reasonable expectation of privacy." Id. However, considering that the officer entered an area which "was not open to the public but rather was a courtyard to a private apartment complex which was fenced off to the general public by a brick wall and a solid black gate," the defendant-tenant had a legitimate and reasonable expectation of privacy in the courtyard area outside of his apartment. Id.

Likewise, in Ragsdale, the officer entered the patio connected to the defendant's apartment. The patio was enclosed by a tall wooden fence with a latched gate, and the slats of the fence were so closely placed that no one could see through the fence. The Court found the nature of the fence, which completely blocked the view of the patio and the apartment off of the patio from the general public, gave the defendant a reasonable expectation of privacy which the officer violated by entering the patio without a warrant.
In State v. Deary, 99-0627 (La.1/28/00), 753 So.2d 200, a police officer *208 walked up onto a porch, looked inside the opened door, and saw the defendant standing with his back to the door. The officer knocked, and the defendant turned and dropped a bag containing what appeared to be cocaine. The Court found that although there was a fence in front of the residence, there was a mailbox on the porch, showing that the residents did not consider the porch to be a private enclave. The Court noted that the officer had just as much right to be on the porch as any casual visitor, and he noticed the contraband the defendant dropped by merely looking though the open door, as could any casual visitor to the porch.
In so finding, the Court relied on its earlier case, State v. Dixon, 391 So.2d 836 (La.1980). Police officers went to the defendant's trailer to investigate a missing juvenile. No one answered their knock, but one officer looked through the window next to the door and saw a fishbowl and a planter containing what appeared to be marijuana plants, as well as what appeared to be marijuana cigarettes. The officers waited outside the trailer. When the defendant and two companions soon arrived, the officers saw someone throw a bag out the car's window. The officers retrieved the bag, which contained drugs, and then arrested the three people in the car. The officers also stopped two other cars that soon appeared and found more drugs and paraphernalia. The officers then obtained a search warrant and searched the trailer, finding more drugs and paraphernalia. On appeal, the Court rejected the defendant's claim that the evidence should have been suppressed because the officer first saw the drugs from the porch. The Court noted that the officer had the same right as anyone else to be on the doorstep, and his observation of the marijuana inside the trailer was not a violation of the defendant's privacy.
Likewise, in State v. Brisban, XXXX-XXXX (La.2/26/02), 809 So.2d 923, officers made a narcotics arrest at a residence next door to the apartment building where they later arrested the defendant. The arresting officer testified that he knew that several older people lived in the apartment building, and these people generally sat out on the building's porch. He testified that these people had told him in the past that if he did not see them on the porch, it was because drug activity was taking place and they did not want to be involved. There was no one on the porch when the officer made the arrest at the building next door, and the officer walked over to the apartment building and stood on the porch. The door to one of the apartments was open, and the officer could see a man inside the apartment sitting at a table cutting what appeared to be crack cocaine. The defendant was sitting on a sofa in the room. The officer entered the apartment, and the defendant lay down on the sofa and pretended to be asleep. The officer searched the defendant and found two crack pipes with residue in his pocket. The Court rejected the defendant's claim that the evidence should have been suppressed, finding that while the front porch was part of the curtilage of the building, it had limited privacy in that it could have been approached by anyone. The Court noted that the contraband would have been visible to anyone standing on the porch.
In State v. Campbell, 93-1959 (La. App. 4 Cir. 5/26/94), 640 So.2d 622, officers received a detailed tip concerning the defendant, his residence, and the house where he stored drugs for sale. The officers followed the defendant from *209 his house to the storage residence. The defendant entered the yard through an unlocked gate. Through a fence made of chain-link, the officers watched as he walked over to the house, removed a bag containing a white powder from his pocket, and placed the bag under the house. The officers then watched as the defendant met with a man across the street and gave him an object. The other man swallowed the object before the officers could stop him, but the officers were able to stop the defendant and found that he was carrying a large amount of money. The officers took the defendant back to the house and seized the bag from under the house, finding it contained a large amount of cocaine. The officers later got a warrant to search the defendant's residence, but they found only residue in a glass vial. On appeal, this court found that because the defendant presented no evidence that he owned or rented the house where he hid the cocaine, he had no reasonable expectation of privacy in the house or its yard. This court held that although the bag of cocaine was within the curtilage of the residence, the defendant had no privacy interest in the residence. This court also noted that the officers were able to see him place the bag with the drugs under the house, and they had probable cause and exigent circumstances that allowed them to enter the yard to retrieve the bag of cocaine.
In State v. Paulson, 98-1854 (La.App. 1 Cir. 5/18/99), 740 So.2d 698, police officers drove to the defendant's house and parked in his driveway to investigate a tip they had received. An officer in one of the cars looked over to a part of the front yard and saw marijuana plants growing in a plot. Although the plants were not visible from the street because of a wooden fence, they were visible from the driveway, which had no fence or gate on it. The court rejected the defendant's claim that his right to privacy had been violated, finding that anyone on the driveway could have seen the marijuana, and thus the defendant did not have a reasonable expectation of privacy.
This court found no reasonable expectation of privacy in State v. Baker, 99-2846 (La.App. 4 Cir. 10/18/00), 772 So.2d 225. Officers were responding to a call when they saw the defendant sitting on the porch of the residence next door. They saw the defendant become nervous and drop a baggie into the grass, and when they retrieved the bag, they found it contained cocaine. This court held that the defendant had no reasonable expectation of privacy in the unfenced front yard where he threw the cocaine.
In State v. Julian, XXXX-XXXX (La.App. 4 Cir. 3/14/01), 785 So.2d 872, this court found that the officers were justified in entering the back yard of the residence in front of which they had seen a drug transaction. The officers had received information concerning drug sales from the residence, and from their surveillance point they saw the codefendant, who fit one of the descriptions given by the informant, standing in the alleyway which led to the back of the residence. While the officers watched, they saw the codefendant engage in what appeared to be a drug transaction in front of the residence. While some officers arrested the codefendant, others walked down the alleyway to the back of the residence, where they saw several people, including the defendant, standing around a washer that had crack cocaine on top of it. The defendant threw down a bag of marijuana as the officers entered the back yard. The officers arrested him, searched him, and found heroin in his pocket. On *210 appeal, this court found that the officers had probable cause to believe there were drugs in the back yard (because the codefendant had come from that direction prior to the drug sale) and had exigent circumstances to enter the yard.
Most recently, in Hemphill, the appellate court upheld the trial court's suppression of the evidence discovered when police officers, acting only on a tip, entered the defendant's back yard and discovered that he was running a methamphetamine lab. The tip indicated that the lab was being run in a shed behind the defendant's trailer and that the defendant "cooked" the methamphetamine after midnight. The officers waited a few days and then approached the defendant's property after midnight across a neighbor's land. The defendant's land was partially fenced, and it was apparent to the officers when they actually entered the defendant's land because the vegetation changed to grass. Some of the officers walked into the defendant's yard and soon smelled ether, which they knew was used in the manufacture of methamphetamine. They saw someone leave the trailer, walk to the shed, and enter it. The officers also heard activity inside the shed. Other officers drove down the defendant's driveway to the shed using bright lights in an effort to flush the person out of the shed. The officers opened the shed door and found the defendant inside, along with equipment for making methamphetamine. The trial court suppressed the evidence, finding that the defendant had a privacy right in the yard and the shed, and the officers did not have probable cause or exigent circumstances to enter the defendant's property. On review, the appellate court affirmed the trial court's ruling, also finding that the officers lacked probable cause until they had entered the defendant's property. The court noted that the property was partially enclosed by a privacy fence, but the part of the yard they entered was not encumbered by the fence. Nonetheless, the court noted that the partial fence evinced a desire by the defendant to distinguish his property from the open land adjacent to it. Based upon the fact that the "there were some steps taken by the defendant toward privacy," the appellate court found that the trial court "was not clearly wrong in finding that the defendant was adversely affected by this entry." Id. at p. 16, 942 So.2d at 1274.
James, at pp. 8-15, 980 So.2d at 774-778.
The appellants acknowledge that in James this court rejected this argument, but they nonetheless reurge it, arguing that the fact that the car wash was a commercial establishment did not render their expectation of privacy unreasonable, given the fact that the business was closed when Det. Barbe looked through the gap in the doors and saw the drugs. Fournette additionally argues that because he was a manager at the car wash, he had a greater expectation of privacy in the car wash. They cite numerous cases that hold that the search of a commercial establishment must comport with the dictates of the Fourth Amendment. However, in those cases, the officers actually entered the business establishment before they observed any contraband. Here, by contrast, Det. Barbe had not entered the car wash when she saw the marijuana lying on the table. Instead, she walked up to the garage doors, which were in an unenclosed area that was open to the public, and looked inside. Contrary to the appellants' allegations, there was no testimony that Det. Barbe "shoved her nose" into the gap left between the doors; she testified that she was standing next to the doors and *211 was able to see the entire room through the gap in the doors. Thus, even if Fournette had a privacy right in the car wash, his expectation of privacy that no one would look through a three-to-five-inch gap in a doorway that opened onto a public area was not reasonable.
Indeed, this case is somewhat similar in this respect to U.S. v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), where the Court held that defendant had no reasonable expectation of privacy in a barn that was open and its interior could be seen from an adjacent open field. Granted, an open barn door shows less of an expectation of privacy than a door with a gap, but if anyone could walk up to the outside of the car wash and look through the gap, Det. Barbe could do so as well. This court in James found that Det. Barbe's actions did not violate a reasonable expectation of privacy, and the cases cited by the appellants do not mandate that this panel conclude otherwise.

Entry into the Premises
The appellants' other main argument concerns the officers' entry into the car wash without first obtaining a warrant. They contend that not only did Det. Barbe's actions violate their right to privacy, but the officers' entry into the car wash prior to obtaining the search warrant was illegal because the officers' actions manufactured any exigent circumstances that occurred in the case.
In State v. Jones, XXXX-XXXX, pp. 5-6 (La.App. 4 Cir. 11/6/02), 832 So.2d 382, 386, this court described the exigent circumstances exception to the warrant requirement:
In State v. Page, 95-2401, p. 10 (La. App. 4 Cir. 8/21/96), 680 So.2d 700, 709, this court discussed the warrantless entry into a protected area:
There is a justified intrusion of a protected area if there is probable cause to arrest and exigent circumstances. State v. Rudolph, 369 So.2d 1320, 1326 (La.1979), cert. den., Rudolph v. Louisiana, 454 U.S. 1142, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). Exigent circumstances are exceptional circumstances which, when coupled with probable cause, justify an entry into a "protected" area that, without those exceptional circumstances, would be unlawful. Examples of exigent circumstances have been found to be escape of the defendant, avoidance of a possible violent confrontation that could cause injury to the officers and the public, and the destruction of evidence. State v. Hathaway, 411 So.2d 1074, 1079 (La.1982).
See also State v. Julian, XXXX-XXXX (La. App. 4 Cir. 3/4/01), 785 So.2d 872; writ den. XXXX-XXXX (La.3/22/01), 8111 So.2d 920; State v. Brown, 99-0640 (La.App. 4 Cir. 5/26/99), 733 So.2d 1282.
See also United States v. Rubin, 474 F.2d 262 (3 Cir.1973), which set forth factors that might lead officers to conclude a warrantless entry is necessary to prevent the destruction of evidence: (1) the amount of time needed to obtain a warrant and the immediacy of the circumstances; (2) a reasonable belief contraband is in danger of being removed or destroyed; (3) the degree of danger to officers guarding the site of the contraband while the warrant is being obtained; (4) information that the person possessing the contraband is aware the officers knows they are in possession; and (5) the ready ability of the person in possession of the contraband to destroy it and/or escape. And see State v. Wright, 2002-2354 (La.App. 4 Cir. 6/18/03), 850 So.2d 778.
In the absence of exigent circumstances, an officer cannot lawfully enter a residence without a warrant. See Kirk v. *212 Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In State v. Kirk, XXXX-XXXX (La.App. 4 Cir. 11/13/02), 833 So.2d 418, officers conducting a surveillance observed four suspected drug transactions from the defendant's apartment, at least one of which involved the defendant. The officers stopped one suspected buyer near the apartment. Finding contraband, the officers went back to the defendant's apartment, entered it to "secure" it, arrested the defendant, and found contraband on his person pursuant to the search incident to his arrest. On appeal of his conviction, the defendant alleged the officers' warrantless entry into his house was illegal due to the absence of exigent circumstances. In its first opinion, State v. Kirk, XXXX-XXXX (La.App. 4 Cir. 11/15/00), 773 So.2d 259, this court found that because the officers had probable cause to arrest the defendant, this court need not consider whether there were exigent circumstances to allow the officers to enter the house to secure it while they obtained a warrant. The Louisiana Supreme Court denied writs. State v. Kirk, XXXX-XXXX (La.11/9/01), 801 So.2d 1063. On review, the U.S. Supreme Court reversed, noting that probable cause by itself would not have justified the officers' entry into the apartment. The Court remanded the case for a determination of whether there were exigent circumstances which would have justified the officers' entry. Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002). On remand, this court found the facts did not support a finding of exigent circumstances, and it suppressed the evidence and reversed the defendant's conviction. State v. Kirk, XXXX-XXXX (La. App. 4 Cir. 11/13/02), 833 So.2d 418.
Likewise, in Jones, this court found there were no exigent circumstances to justify the officers' warrantless entry into a residence. The officers conducted a surveillance of a targeted residence for three days over a period of one and a half months. On each occasion they observed suspected drug transactions, and after the first two days they had obtained an arrest warrant for one of the participants. In addition, they had also begun preparing a search warrant application for the residence, but they were waiting for additional information from the third day of surveillance. After watching more suspected drug sales on the third day of the surveillance, the officers stopped one of the participants "near" the residence. After finding contraband and arresting the participant, they then entered the residence to secure it while they sought the search warrant and in fact began searching the residence prior to the issuance of the warrant. The trial court suppressed the evidence, finding the fact that the participant was arrested "near" the residence did not give the officers exigent circumstances to enter the residence prior to the issuance of the warrant. This court agreed and upheld the suppression of the evidence.[3]
By contrast, in Wright, this court found there were exigent circumstances to justify the officers' warrantless entry into a residence. Police officers received a tip about drug activity at a residence, and they set up a surveillance of the residence during which they saw suspected drug transactions. *213 They later observed a woman looking at their surveillance position, and the woman approached the defendants as they were standing outside and spoke with them. One of the defendants ran inside, and the officers approached the residence and entered it to secure it while they obtained a search warrant. On appeal, the defendants argued the evidence should have been suppressed because the officers did not have exigent circumstances to enter the house without a warrant. This court disagreed, distinguishing Kirk:
In the instant case, unlike Kirk, the detectives observed an unidentified woman looking at their surveillance position, and the woman had a conversation with both the defendants, which then caused the defendant Richardson to run into the residence at 2802 Freret Street. Prior to the woman observing their surveillance position, the detectives observed both the defendants conduct hand-to-hand drug transactions on the front porch of the residence on Freret Street. The detectives had reason to believe their surveillance position had been made known to the defendants, and that the defendants knowing they had been observed by police officers would destroy evidence. We find that the detectives had probable cause to arrest the defendants and exigent circumstances to justify entering the residence to ensure no evidence was destroyed until a search warrant could be obtained. Therefore, we find that the trial court did not abuse its discretion in denying the motion to suppress the evidence. This assignment of error is without merit.
Wright, 2002-2354 at p. 6, 778 So.2d at 781.
Here, contrary to the appellants' assertions, the officers' probable cause to believe that the car wash contained drugs was not obtained illegally. However, it appears that any exigency that the officers had was caused by Det. Keaton's decision to pound on the door and try to go inside. Indeed, Det. Keaton testified that the suspects would not have been able to escape the car wash undetected while they obtained a warrant, and there was no indication that the men inside the car wash knew that the officers were outside or had discovered that drugs were inside until Det. Keaton pounded on the door, announced the officers' presence, and demanded that they open the door. Without exigent circumstances, the officers could not lawfully enter without a warrant. Thus, the officers' entry was not lawful.

Inevitable Discovery/Probable Cause for the Search Warrant
The illegal entry, however, does not mandate that the evidence be suppressed in this case if the officers would have inevitably discovered the evidence pursuant to the search authorized by the warrant. See United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); State v. Lee, 2005-2098 (La.1/16/08), 976 So.2d 109; State v. Vigne, 2001-2940 (La.6/21/02), 820 So.2d 533. In Jones, this court discussed the inevitable discovery doctrine and ultimately found that it did not apply to that case because the officers started searching the residence before they obtained the warrant:
The other basis for this court's earlier ruling was that the evidence did not need to be suppressed because the evidence would have inevitably been discovered once the officers obtained the warrant. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In United States v. Crews, 445 *214 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the Court noted there are three exceptions to Wong Sun's exclusionary rule: the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. See also State v. Welch, 449 So.2d 468 (La.1984); State v. Irby, 93-2220 (La.App. 4 Cir. 2/4/94), 632 So.2d 801. As this court noted in State v. Tassin, 99-1692, pp. 4-5 (La. App. 4 Cir. 3/15/00), 758 So.2d 351, 354:
In Nix v. Williams, 467 U.S. 431, 446-47, 104 S.Ct. 2501, 2510-11, 81 L.Ed.2d 377 (1984), the Supreme Court held that the exclusionary rule does not apply when the State proves that the unconstitutionally obtained evidence would inevitably have been found in a constitutional manner. "The court's decision was based on its belief that it is unfair to penalize the government through application of the exclusionary rule where the police would have obtained the evidence even if no misconduct occurred." State v. Garner, 621 So.2d 1203, 1208 (La.App. 4 Cir.1993), writ denied, 627 So.2d 661 (La.1993).
* * *
It is not clear, however, that the fact that the officers eventually got the warrant would save the warrantless search in this case. In Kirk, the officers entered the house and found drugs in plain view. They obtained a search warrant while they detained the defendant in his home. Nevertheless, the U.S. Supreme Court vacated the defendant's conviction and sentence, even though they ultimately obtained the search warrant for the residence, because there was no finding of exigent circumstances which justified their prior entry into the residence. Here, the court found no exigent circumstances, and for the reasons set forth above, the trial court may well have been justified in so finding due to the fact that any "exigency" in this case was due to the officers' actions (or inactions) rather than to circumstances beyond the officers' control. Under Kirk if there were no exigent circumstances to support the entry, the subsequent issuance of the search warrant would not cure the taint of the illegal entry.
Jones, XXXX-XXXX at pp. 7-8, 832 So.2d at 387-388. In Kirk, the U.S. Supreme Court stated: "We express no opinion on that question [of whether there were exigent circumstances in that case], nor on respondent's argument that any Fourth Amendment violation was cured because the police had an "independent source" for the recovered evidence." 536 U.S. at 638, 122 S.Ct. at 2458. However, in Kirk the probable cause to issue the search warrant was based upon information gleaned from the illegal entry.
By contrast, here the search warrant affidavit contains no information that was gleaned from the officers' entry into the car wash. The only reference to the officers' entry is the statement that the officers entered the car wash to secure it while Det. Barbe obtained the search warrant. Thus, because the warrant was not based upon any information gleaned from the illegal entry, it was not tainted by that entry, and the inevitable discovery doctrine would apply in this case if the search warrant was lawfully issued.
The affidavit itself presented probable cause for the issuance of the warrant. Probable cause is shown "when the facts and circumstances within the affiant's knowledge and of which he has reasonably *215 trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280, 1283 (La.1982). See also State v. Green, XXXX-XXXX (La.12/4/02), 831 So.2d 962; State v. Rando, XXXX-XXXX (La.App. 4 Cir. 4/9/03), 848 So.2d 19. The affidavit must give the magistrate sufficient information "to enable him to determine that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal justice system." State v. Rodrigue, 437 So.2d 830, 833 (La.1983). See also State v. Green; State v. Rando. The magistrate then must determine whether the affidavit sets forth sufficient information to conclude that there is a fair probability that evidence of a crime or contraband will be found in the place described in the warrant. The information supporting a finding of probable cause for the issuance of a search warrant must be contained within the "four corners" of the affidavit. In Green, the Court set forth the standard for appellate review of a magistrate's determination of probable cause:
The task of a reviewing court is simply to insure that under the totality of the circumstances the issuing magistrate has a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Accordingly, in Rodrigue, we stated, "The magistrate's determination of probable cause, prior to issuance of a search warrant, is entitled to significant deference by the reviewing court and marginal cases should be resolved in favor of finding the magistrate's assessment to be reasonable." Rodrigue, 437 So.2d at 833. Moreover, if the magistrate finds the affidavit sufficiently detailed and reliable to show probable cause, reviewing courts should interpret the affidavit in a realistic and common sense fashion, aware that it is normally prepared by non-lawyer police officers in the midst and haste of a criminal investigation. Within these guidelines, courts should strive to uphold warrants to encourage their use by police officers. State v. Jenkins, XXXX-XXXX (La.6/22/01), 790 So.2d 626 (citing United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)); State v. Loera, 530 So.2d 1271, 1278 (La.App. 2 Cir.1988), writ denied, 536 So.2d 1252 (La.1989).
State v. Green, XXXX-XXXX at p. 8, 831 So.2d at 969. See also State v. Rando. The defendant bears the burden of proof to show that evidence seized pursuant to a search warrant should be suppressed. State v. Williams, XXXX-XXXX (La.App. 4 Cir. 10/6/03), 859 So.2d 751.
Here, the affidavit details the tip Sgt. Morrell received, Dets. Barbe's and Keaton's surveillance of the car wash, and Det. Barbe's observations though the gap in the garage doors of the marijuana, the packaging materials, and the gun on the table. The appellants argue that the affidavit contains misleading information because it notes that Sgt. Morrell received a tip from a "reliable confidential informant (CI), who receives no monetary compensation for their [sic] help" and that the C.I. "has previously assisted Sgt. Morrell in numerous investigations resulting in several arrests and seizures of narcotics," while Sgt. Morrell admitted that the tip was from an anonymous source. However, Sgt. Morrell testified at the July 2005 hearing that although he did not know the C.I.'s identity, the informant had called in the past, had asked for Sgt. Morrell specifically, and had *216 provided him with information in the past. Thus, at most the information contained in affidavit about the informant was an inadvertent misrepresentation, which would require the reviewing court to excise this information from the affidavit when considering whether the affidavit provided probable cause for the issuance of the warrant, rather than a material and intentional misrepresentation, which would invalidate the affidavit and, thus, the warrant. See State v. Adams, 99-2123 (La.App. 4 Cir. 1/24/01), 779 So.2d 113; State v. Page, 95-2401 (La.App. 4 Cir. 8/21/96), 680 So.2d 700.
Moreover, the main basis for the issuance of the warrant was not that Sgt. Morrell had received a tip of drug packaging in the car wash; rather it was Det. Barbe's observation of the marijuana, the packaging materials, and the gun, items she saw clearly through the gap in the garage doors. These observations provided the magistrate with probable cause to believe that there were drugs in the car wash and thus probable cause for the issuance of the warrant. Because this probable cause was not based upon any information gleaned from the officers' entry into the car wash, the inevitable discovery doctrine applies to this case.[4] Therefore, the trial court did not err by denying the motion to suppress the evidence in this case.
This court has held that a "trial court is vested with great discretion when ruling on motion to suppress." State v. Scull, 93-2360, p. 9 (La.App. 4 Cir. 6/30/94), 639 So.2d 1239, 1245. Here, the trial court did not err by denying the motion to suppress the evidence. This assignment of error has no merit.

DECREE
Accordingly, the appellants' convictions and sentences are affirmed.
AFFIRMED.
LOMBARD, J., concurs with reasons.
LOMBARD, J., concurring.
The expectation of privacy pertaining to commercial property differs significantly from the sanctity accorded to an individual's home, Donovan v. Dewey, 452 So.2d U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), and, in any event, the Louisiana Supreme Court held that observations by a police officer who walks up and looks into the front door of a residence does not violate the Fourth Amendment prohibition against illegal search and seizure. State v. Deary, XXXX-XXXX, p. 2 (La.1/28/00), 753 So.2d 200. Thus, although the subsequent decision of the police to illegally enter the building rather than obtaining a search warrant is problematic, in light of the inevitable discovery doctrine I cannot find that the trial court abused its great discretion in denying the defendants' motion to suppress. See also State v. James, XXXX-XXXX, p. 17 (La.App. 4 Cir. 3/12/08), 980 So.2d 769, 779 (Belsome, J., concurrence).
NOTES
[1] Darell James and Harry Wilson were also charged in these counts. James eventually pled guilty reserving his right to appeal the trial court's ruling on the motion to suppress the evidence. This court affirmed. State v. James, XXXX-XXXX (La.App. 4 Cir. 3/12/08), 980 So.2d 769. Wilson eventually pled guilty as well. They are not parties to this appeal.
[2] Writ denied 2006-2976 (La.3/9/07), 949 So.2d 441.
[3] See also the cases cited by the appellants, McDonald v. U.S., 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); U.S. v. Gomez-Moreno, 479 F.3d 350 (5th Cir.2007); and U.S. v. Mercadel, 226 F.Supp 2d 810 (E.D.La.2002), where the courts found the entries were illegal.
[4] Contrary to the appellants' assertions, not all of the evidence was discovered before the warrant was issued. The big bag of marijuana found in the rafters and the bag with the cocaine found in the bin were seized after the issuance of the warrant.