DANIEL L. DYSART, Judge.
| Russel Bentley appeals his conviction for second degree murder arguing that the trial court erred in not granting his motion to suppress the evidence. For the following reasons, we affirm.
STATEMENT OF CASE:
Defendant, Russel Bentley (“Bentley”), and a co-defendant, Norman Newman (“Newman”), were charged by grand jury indictment with one count of first degree murder, in violation of La. R.S. 14:30. The bill of indictment provided that Bentley and Newman committed first degree murder of Clifton Barnes on July 19, 2006, while perpetrating or attempting to perpetrate an armed robbery.
Bentley and Newman filed motions to suppress the evidence and identification. The trial court denied the motions to suppress the evidence, specifically regarding the seizure of the gun. The defendants sought review in this court, which was denied.
Thereafter, the State amended the bill of indictment to charge both Bentley and Newman with second degree murder. Newman pled guilty to a charge of manslaughter, in violation of La. R.S. 14:31, and received a forty year sentence. | ¡The State also offered Bentley a plea bargain of twenty years in exchange for a guilty plea, which he refused.
Bentley was found guilty by a jury of the amended charge of second degree murder. He subsequently filed a motion for new trial which was denied. The same day, the trial court sentenced Bentley to life in prison without benefit of probation, parole, or suspension of sentence.
FACTUAL BACKGROUND:
In July of 2006, the victim, Clifton Barnes (“Clifton”), and his wife, Tyra Barnes (“Tyra”), were living in a FEMA trailer near Clifton’s barbershop with their two young children in the 3600 block of St. Claude Avenue.
Tyra testified that on July 16, 2006, two men came to the trailer asking for her husband, who was in Texas with their son. The two men returned the following two days. After the third visit, Tyra observed the two men sitting in a red Camaro with a black hood, watching the residence. She stated that she became concerned, but did not notify authorities.
On July 19, 2006, Clifton returned from Texas. Tyra told him about the two men, but Clifton said he did not know who they were. Later that afternoon, the Barnes’s went to the bank and withdrew about $9,000.00 to purchase building materials to rebuild their flooded home. They returned home with about $3,500.00.
That evening, the same two men, who had previously visited, knocked on their door and asked Clifton for a haircut. Clifton told them that he was closed for the night, but to return the next morning. The two men then backed Clifton into the trailer at gun point. Tyra testified that one man, later identified as Newman, had the gun and demanded money. The other man, later identified as Bentley, |sstood at the door of the trailer. When Clifton asked the men what they were doing, Newman again demanded money and shot *894 Clifton. The men allowed Tyra to go into the bedroom with the children. Newman again demanded, “where’s your money?” Clifton again stated that he did not have any money, and Newman shot Clifton again. Tyra heard Newman again demand money. Clifton stated that he did not have any. She then heard Bentley say “hit him in the head” and Clifton plead “don’t do this; I have a family.” Newman shot Clifton two more times, once in the head, killing him. Tyra testified that she did not see her husband give the men money but that after they had left, her husband’s pants were down around his knees and the money was gone. The police were called, and Tyra gave the description of the two men and the events that unfolded. Several days later, she identified Newman and Bentley out of two separate photographic line ups as the men who killed her husband.
Sergeant Ronald Ruiz (“Sgt. Ruiz”) of the NOPD testified that he responded to the scene on St. Claude Avenue. He stated at the motion to suppress hearing that he developed Newman as a suspect from a “crimestoppers” tip. During the investigation, Sgt. Ruiz determined that Newman was residing in an apartment on Parc Brittany Boulevard. As a result, Sgt. Ruiz conducted a surveillance of the apartment complex and observed a red Camaro that matched Tyra’s description. After determining that the Camaro was registered to Newman, Sgt. Ruiz compiled the photographic line-up from which Tyra identified Newman as the gunman.
Thereafter, Sgt. Ruiz spoke with the apartment manager at Parc Brittany to determine in which apartment Newman was living. Sgt. Ruiz subsequently obtained an arrest warrant for Newman and a search warrant for his apartment. A SWAT team executed the warrants, while Sgt. Ruiz and other members of the 14homicide team waited in the parking lot. The SWAT team found Newman, his wife Conchetta Jackson (“Conchetta”), their two children, and Bentley inside the apartment. Bentley was found in the children’s bedroom where he had been sleeping.
Ruiz testified that when he entered the apartment, Conchetta and Bentley were handcuffed sitting at the dining room table, and the children were sitting on the sofa. Newman was injured during the SWAT team entry and immediately taken to the hospital. After interviewing Con-chetta, Sgt. Ruiz and other members of the homicide team searched the apartment.
During the search, the police confiscated two photographs of Newman in the red Camaro as well as a Glock pistol. The handgun was found inside a duffel bag between the children’s beds, next to where Bentley was sleeping. Ruiz identified the duffel bag and handgun found in the children’s room from a photograph at trial. He also identified the Glock .40 caliber handgun, magazine, and eight live .40 caliber rounds, as the items he discovered in Bentley’s duffle bag. Sgt. Ruiz testified that Bentley was developed as an additional suspect because he was inside Newman’s residence and because he matched Tyra’s general physical description of the second man who had entered her trailer. Tyra subsequently identified Bentley’s photograph in a line-up.
As noted by the State, due to a hearsay objection, Sgt. Ruiz could not testify at trial as to Bentley’s location during the SWAT tekm’s entrance. However, Sgt. Ruiz’s testimony from the motion to suppress hearing provides that the SWAT team informed him that Bentley was sleeping in one of the children’s beds, next to the duffle bag containing the handgun.
^Conchetta, who divorced Newman pri- or to trial, testified that Bentley was residing at the Parc Brittany apartment with *895 them for approximately two weeks before the search. He slept in her children’s’ bedroom and had a duffle bag with clothes. Conchetta testified that when the police entered their apartment, she asked Bentley if he had anything in their home, and he nodded his head towards the children’s room. Conchetta testified that on the night of the incident, when the police officers showed her the handgun found in the duffle bag, she stated, “that’s not his [Newman]; he doesn’t have anything to do with guns.” Meredith Acosta, a firearms examiner for the Jefferson Parish Sheriffs Officer, testified that the bullet casings found at the trailer on St. Claude matched the .40 caliber pistol found at the Parc Brittany apartment.
DISCUSSION:[1]
As his sole assignment of error, Bentley contends that the trial court erred in denying his motion to suppress the evidence and abused its discretion in allowing the State to introduce the gun seized in the home of Newman as being in the possession of Bentley.
The trial court is vested with great discretion when ruling on a motion to suppress and, consequently, the ruling of a trial judge on such a motion will not be disturbed absent an abuse of that discretion. State v. Bridges, 11-1666, p. 4 (La.App. 4 Cir. 11/28/12), 104 So.3d 657, 660. The district court’s findings of fact on a motion to suppress are reviewed under a clearly erroneous standard, and its ultimate determination of Fourth Amendment reasonableness is reviewed de novo. State v. Pham, 20-2199, p. 4 (La.App. 4 Cir. 1/22/03), 839 So.2d 214, 218; U.S. v. Seals, 987 F.2d 1102, 1106 (5 Cir.1993).
Bentley argues that the trial court committed error in admitting the gun into evidence because Sgt. Ruiz provided inconsistent testimony as to the search and subsequent seizure of the gun, and because the search of Bentley’s duffle bag was outside the scope of the search warrant.
Testimony of Sgt. Ruiz:
Bentley argues that the only evidence supporting that the gun was within Bentley’s possession was the “duplicitous” and inconsistent testimony of Sgt. Ruiz. Bentley claims Sgt. Ruiz is unreliable because he was “convicted in federal court for lying to an FBI agent in the attempt to cover-up the murder of Henry Glover.”
In support of this argument, Bentley cites an article from the Times Picayune website allegedly reporting Sgt. Ruiz’s conviction. The article provides that Sgt. Ruiz was investigated by the NOPD and reassigned to desk duty following the verdict in the Glover case[2] in December of 2010. He was not convicted.
The State argues this Court cannot consider the investigation of Sgt. Ruiz in evaluating Bentley’s assignment of error as it is outside the record for appeal and because any pending investigation, without a conviction, could not be used for impeachment purposes. The State’s argument has merit.
It is well established that an appellate court may not consider evidence which is outside the record. State v. Johnson, 09-0259, p. 10 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 212; State v. Sylvester, 10-1021, p. 7 (La.App. 4 Cir. 3/30/11), 63 So.3d 288, 293. Moreover, an appellate court will only review issues that were submitted to the trial court. La. Uniform Rules— *896 Courts of Appeal 1-3; see also, La.Code Crim. Proc. art. 841 (a new basis for an objection cannot be raised for the first time on appeal).
Generally in a criminal case, “only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, indictment or a prosecution.” La.Code Evid. art. 609.1(B). Moreover, as noted by the State, this Court, in State v. Howard, 00-2700, p. 20 (La.App. 4 Cir. 1/23/02), 805 So.2d 1247, 1260-1261, found that evidence that a police officer was under criminal investigation was not admissible to attack his credibility because “even if the State knew of the pending investigation, such information was not Brady information to which the defendant was entitled.”
Bentley also claims that Sgt. Ruiz is unreliable because he provided inconsistent testimony concerning the execution of the search warrant. However, our review of the record reveals that Sgt. Ruiz provided similar testimony at both the hearing and the trial.
Sgt. Ruiz testified at the suppression hearing that Bentley was in the same room as where the firearm was located, but admitted that he and the homicide team were in the parking lot of the apartment complex while the SWAT team made entry. He stated after the SWAT team secured the residence for officer safety, he entered the premises and was informed by the SWAT team supervisor that Bentley was sleeping in the children’s room on the first bed closest the door. Sgt. Ruiz testified that he subsequently observed the duffle bag between the two children’s beds and upon searching the bag, discovered the handgun.
|RAt trial, Sgt. Ruiz also testified that he was not present for the SWAT team’s initial entry into the apartment, but was downstairs. He testified that he located the duffle bag containing the handgun between the two beds. However, after a hearsay objection by the defense, Sgt. Ruiz was prohibited from testifying that the SWAT team had informed him that they discovered Bentley asleep in the children’s bedroom.
Bentley attempts to argue that Sgt. Ruiz admitted at trial that he had nothing to do with the discovery of the duffle bag and that it was the SWAT team, and not Sgt. Ruiz, who discovered the handgun. However, a reading of the transcript demonstrates that Sgt. Ruiz was explaining for the benefit of the jury how the police and the SWAT team generally execute a search warrant pursuant to the defense attorney’s instruction. Sgt. Ruiz did not testify that he did not find the handgun at issue, nor did he testify, as Bentley suggests, that another officer of the SWAT team found the handgun.
The only real “inconsistency” that exists between the hearing and trial transcript is that Sgt. Bentley was able to testify at the suppression hearing that Bentley was in close proximity to the duf-fle bag containing the firearm when the SWAT team gained entry, while at trial Sgt. Ruiz was precluded from testifying as to Bentley’s location due to a hearsay objection by the defense. However, because hearsay testimony is admissible in a suppression hearing, the trial court was entitled to rely on Sgt. Ruiz’s representations in denying the motion to suppress. See, State v. Shirley, 08-2106, pp. 5-7 (La.5/5/09), 10 So.3d 224, 228-229 (hearsay rules do not apply in hearings on motions to suppress evidence); State v. Lee, 11-0398, p. 6 (La.App. 4 Cir. 1/30/12), 83 So.3d 1191, 1196 (“there is a relaxation in ^suppression hearings of the evidentiary *897 rules which ordinarily govern the conduct of a trial”). As such, Bentley’s arguments in this regard have no merit.

Search Warrant:

Bentley also argues that the trial court erred in refusing to suppress the gun because the police officers had no authority to search Bentley’s bag under the search warrant.
The Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution protect people against unreasonable searches and seizures. U.S. Const. Amend. IV; La. Const. Art. 1, § 5; State v. Francis, 10-1149, p. 4 (La.App. 4 Cir. 2/16/11), 60 So.3d 703, 708 writ denied, 11-0571 (La.10/7/11), 71 So.3d 311. In addition to conferring similar protections to the Fourth Amendment, Article 1, § 5 of the Louisiana Constitution expands the scope of protection, affording Louisiana citizens standing to contest the illegality of a search or seizure to “any person adversely affected.” La. Const. Art. 1, § 5; State v. Gant, 93-2895 (La.5/20/94), 637 So.2d 396, 397; State v. Lewis, 08-0172, p. 3 (La.App. 4 Cir. 6/25/08), 988 So.2d 789, 790-791.
However, a judge may issue a warrant authorizing the search for and seizure of anything within the territorial jurisdiction of the court which “[m]ay constitute evidence tending to prove the commission of an offense.” La.Code Crim. Proc. art. 161(A)(3). A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts that establish the cause for the issuance of the warrant. La.Code Crim. Proc. art. 162 A. The search warrant shall particularly describe the person or place to be searched, the person or things to be seized, and the lawful purpose or reason for the search. U.S. Const. Amend. IV; La. Const. Art. I, § 5; La.Code Crim. Proc. art. |in162(C). While in the course of executing a search warrant, a peace officer may make photographs, lift fingerprints, seize things whether or not described in the warrant that may constitute evidence tending to prove the commission of any offense, and perform all other acts pursuant to his duties. La.Code Crim. Proc. art. 165. The defendant bears the burden of proof to show that evidence seized pursuant to a search warrant should be suppressed. State v. Fournette, 08-0254, p. 26 (La.App. 4 Cir. 7/2/08), 989 So.2d 199, 215; La.Code Crim. Proc. art. 703(D).
The warrant in the instant case authorized the officers to search for “[a]ny and all firearms, instrumentalities associated with it[s] use (I.E. ammunition, cleaning kits, registration papers), blood stained clothing” within the Parc Brittany apartment.
Nevertheless, Bentley asserts because he was not named in the search warrant and was a “mere guest within the Newman household,” the search of his duffle bag was outside the scope of the search warrant.[3]
The State disagrees citing State v. Evans, 98-0992 (La.App. 4 Cir. 6/24/98), 715 So.2d 695 to support its position. In Ey- *898 ans, after receiving complaints of gunfire and finding spent casings, the police obtained a warrant to search the residence of the defendant for “[a]ll firearms, more specifically a .45 caliber weapon and a .223 caliber weapon” in order to compare the casings. Id., 715 So.2d at 697. When the officers arrived to execute the search warrant, the In defendant was asleep in bed with a woman. In searching the residence, an officer found marijuana in the pocket of a coat in the defendant’s bedroom. When both occupants were advised they would be charged with drug violations, the defendant stated that the marijuana belonged to him and was arrested for possession of marijuana. The defendant filed a motion to suppress claiming the search exceed the scope of the search warrant because there was no detectable bulge or indication that the pocket held a weapon. The State argued a .45 was small enough to fit into a pocket; thus, the officers had a legal right to confiscate the controlled dangerous substance found while searching for the gun. The trial court suppressed the evidence, but this Court granted writs and reversed holding that the officers did not exceed the scope of the search warrant. The Evans Court reasoned:
... Given that a warrant authorized a search of the residence and the coat was located in the residence, it does not appear the officers exceeded the scope of the warrant when they searched the pocket of the coat found in the residence.
The issue of whether the officer observed a bulge in the pocket appears to be irrelevant as this was not a pat down search for weapons under the detention statute. Depending upon the size of the coat pocket, a small weapon may very well have been concealed in the coat pocket. Sufficient probable cause to believe a weapon was being kept somewhere in the residence already existed. Absent some testimony clearly establishing or suggesting that a weapon could not possibly have been concealed in the coat pocket, the scope of the arrest warrant was not exceeded.
Id. at pp. 3-4, 715 So.2d at 697-698 (citations omitted).
The State’s argument is persuasive as the search warrant in the instant case authorized a search of the apartment for any firearms or instrumentalities associated with its use, and the police officers could reasonably assume, like the |12officers in Evans, that a firearm or any related items would be concealed in a duf-fle bag.
The duffle bag was a container that could hold items identified in the warrant. Therefore, the search of the bag was within the scope of the warrant, and Bentley’s constitutional rights were not violated by the search.
Further, Conchetta testified that Bentley had been living with her family for approximately two weeks prior to the execution of the search warrant. She further stated that Bentley had been staying in her children’s room and that he had a duffle bag “with his clothes in it” in the room. Sgt. Ruiz testified that Bentley was sleeping in the children’s room when the SWAT team entered the residence, which indicates that Bentley’s connection to the apartment was more than a mere visitor or passerby.
Bentley claims, however, that the testimony of Sgt. Ruiz’s and Conchetta is insufficient to establish a relationship to the residence because Sgt. Ruiz did not actually observe Bentley asleep in the apartment and because Conchetta’s credibility, as Newman’s ex-wife, is questionable. Bentley claims Conchetta is unreliable because it was her husband who used the gun to *899 kill Clifton and unbelievable because she stated that she was unaware that Newman had pled guilty to killing Clifton.
However, as explained above, hearsay is admissible at hearings on motions to suppress the evidence, and this Court may review the entire record to determine the correctness of a trial court’s pretrial ruling.[4] Bentley’s argument in this regard lacks merit.
| ^Bentley’s argument concerning Con-chetta’s credibility likewise lacks merit as credibility determination is a question fact within the sound discretion of the trial court and may not be overturned unless clearly contrary to the evidence. See, State v. Hunt, 09-1589, p. 6 (La.12/1/09), 25 So.3d 746, 751. Here, Conchetta indicated on redirect that the reason she did not know of Newman’s plea was because she was no longer involved with him and not following the case. Moreover, Sgt. Ruiz was instructed by the SWAT team that Bentley was sleeping in the children’s room at the time of their entry. As such, there is evidence supporting the trial court’s ruling on the motion to suppress.
It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Robinson, 10-0885, p. 7 (La.App. 4 Cir. 12/21/10), 54 So.3d 1208, 1213. As noted earlier, credibility determinations are within the sound discretion of the trial court, are entitled to great weight, and cannot be disturbed unless clearly contrary the evidence. State v. Brown, 09-657, p. 5 (La.App. 4 Cir. 10/14/09), 23 So.3d 989, 992. Considering that the warrant was issued for the purpose of seizing any firearms contained in the residence; that the duffle bag was located in the residence; that Bentley was not just a transient visitor; and that the bag was not in his physical possession at the time it was searched, it was not unreasonable for the police officer to assume a firearm or any instrumentalities associated with its use could be concealed in the duffle bag or that the bag was covered by the search warrant. The record therefore supports the trial court’s denial of the motion to suppress.
1,4Accordingly, for the reasons assigned, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. A review of the record for errors patent reveals none.

. The Glover case involved the death of a citizen in the aftermath of Hurricane Katrina. Several NOPD officers were implicated in the incident.

. Bentley fails to cite any authority to support his "mere guest” argument. However, Bentley does cite Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) as well as a few other cases. Those cases are distinguishable because they involved a search of a visitor’s person, not of a visitor’s bag. See, Ybarra, 444 U.S. at 92, 100 S.Ct. at 342 (holding that the issuance of a search warrant for a bar and the bartender working there did not extend to the search/pat-down of a patron of the bar in the absence of any indication that the bar was frequented by drug users or that patrons were seen using drugs in the bar, or reasonable belief that the patron was involved in criminal activity or armed and dangerous).

. See, State v. Martin, 595 So.2d 592, 596 (La. 1992) (in reviewing a trial court's ruling on a motion to suppress, appellate court may consider the entire record).